# Transcript of M. Arnold Politzer

**Date:** July 27, 2018
**Case:** ZTY Investments, LLC -v- Tao

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

IN THE CIRCUIT COURT FOR BALTIMORE CITY

------------------------------x

ZTY INVESTMENT, LLC, :

Plaintiff, :

-v- : Case No.

XIN TAO, et al., : 24-C-17-002408 OT

Defendants. :

------------------------------x

Deposition of M. ARNOLD POLITZER, ESQUIRE

Baltimore, Maryland

Friday, July 27, 2018

10:37 a.m.

Job No. 199823

Pages 1 - 94

Reported by: Jacquelyn C. Jarboe, RPR

Deposition of M. ARNOLD POLITZER, ESQUIRE, held at the offices of:

PLANET DEPOS - BALTIMORE
100 East Pratt Street
Suite 2560
Baltimore, Maryland 21202
(888) 433-3767

Pursuant to Subpoena and Notice of Deposition - M. Arnold Politzer, Esquire, before Jacquelyn C. Jarboe, Registered Professional Reporter and Notary Public in and for the State of Maryland, who officiated in administering the oath to the witness.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF ZTY INVESTMENT, LLC:

LARRY H. KIRSCH, ESQUIRE
LAW OFFICES OF LARRY H. KIRSCH
402 Long Trail Terrace
Rockville, Maryland 20850
(202) 237-6600

ON BEHALF OF DEFENDANTS XIN TAO, ET AL.:

IAN T. VALKENET, ESQUIRE
YOUNG & VALKENET
600 Wyndhurst Avenue
Suite 230
Baltimore, Maryland 21210
(410) 323-0900

C O N T E N T S


| EXAMINATION OF M. ARNOLD POLITZER, ESQUIRE | PAGE |
|---|---|
| By Mr. Kirsch | 5 |


E X H I B I T S

(Attached to the Transcript)


| POLITZER DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena and Notice of Deposition - M. Arnold Politzer, Esquire | 6 |
| Exhibit 2 | Document, PIRES 002409 - 2414 | 7 |
| Exhibit 3 | Due Diligence Report | 28 |
| Exhibit 4 | Legal Fees statements | 39 |
| Exhibit 5 | Purchase and Sale Agreement | 42 |
| Exhibit 6 | Document entitled Baltimore | 71 |

P R O C E E D I N G S

Whereupon,

M. ARNOLD POLITZER, ESQUIRE

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION BY COUNSEL FOR
PLAINTIFF ZTY INVESTMENT, LLC

BY MR. KIRSCH:

Q Good morning, sir. My name's Larry Kirsch, we met before. I'm the counsel for plaintiffs in this matter, ZTY Investment, LLC, and Haiyi, that's H-A-I-Y-I, Nina, Huang, H-U-A-N-G.

Sir, you're here pursuant to a subpoena, correct --

A That is correct.

Q -- and notice of deposition.

MR. KIRSCH: Would you mark that.

THE WITNESS: One thing, Counsel, I do have a bit of a hearing problem, the hearing aids work when they want to. So I may ask you to

repeat.

MR. KIRSCH: Not a problem. Sometimes I speak low. I will try to raise my voice.

THE WITNESS: That was okay.

MR. KIRSCH: Okay. Can we mark this.

(Politzer Deposition Exhibit 1 was marked for identification and is attached to the transcript.)

Q I'm going to show you what's marked as Exhibit 1 and just confirm that this is the subpoena which you received.

A It is the subpoena that I did receive.

Q Okay. And could you state your business address for the record.

A Certainly. 401 Washington Avenue, Suite 803, Towson, Maryland 21204.

Q And your profession?

A Attorney.

Q And which jurisdictions are you licensed in?

A Maryland.

Q How many years have you been licensed in

the State of Maryland?
A 43.
Q So what year were you admitted?
A I believe '75.
Q Okay. Do you anticipate at this point claiming any privilege at this deposition?
A At this point I don't anticipate it.
Q Okay. All right, let me get some background questions. At some point you were retained to provide services for a project known as the Baltimore Harlem Park Investment project; is that correct?
A Yes, sir.
(Politzer Deposition Exhibit 2 was marked for identification and is attached to the transcript.)
Q I show you what's marked as Exhibit 2. If you could look at that.
A Give me a moment, Counsel.
Q Sure, take your time.
A Okay.
Q Okay. Have you seen this document

before this deposition?
A I have.
Q The first two pages, is that your handwriting, those handwritten portions, the cover sheet and the --
A Well, the first two pages are not my handwriting.
Q They're not your handwriting?
A No.
Q Okay. There is an attached retainer, there's no signature page. Excuse me, there's a signature page but it's only signed by Cindy Tao. Do you recall whether this was the retainer agreement that your office had signed?
A Yes, best of my knowledge it is.
Q Okay. And where I'm going to is on the terms of engagement for legal representation. So my first question is do you know, who was the client who retained you?
A I believe the client was Harlem Park Investment -- Baltimore Harlem Park Investment.
Q Okay. And I'm just trying to figure

out, do you know why there's no reference to Baltimore Harlem Park Investment anywhere?

A I do. That entity was not identified to me as of the time that I was engaged.

Q Okay. But do you recall, it says -- the first name is a handwritten name, Cindy Tao. Do you remember if you had met with Cindy Tao?

A Oh, I hadn't met with Cindy. You're talking about prior to the engagement?

Q No, at this time. As part of the engagement did Cindy Tao retain you to represent the interests in this Baltimore Harlem Park?

A I don't believe I met with Cindy Tao minimum of three months, perhaps more, from the time this agreement was entered into to the time I first met her.

Q I'm not sure I understand that.

A All right.

Q So let's -- maybe I need to back up. I'm just really trying to find out the background for the retention.

A Sure.

Q Do you recall, did Ms. Tao call you and seek engagement of your services?
A She did not.
Q Okay. How did you get involved and how were you engaged then?
A I had a client whose name was Sean Leonce. Mr. Leonce, well, in my day, which was not his day, would be called a bird dog, whose occupation it was to go out and find deals, typically deals in real estate. So for lack of a more modern term, that's what I understood Mr. Leonce to be.
Mr. Leonce had been a client of mine for probably one or two years prior to that, I had done various legal work for him. He contacted me perhaps in March and said that he was involved in a business situation where he had a client that was interested in purchasing a first deed of trust.
Q Can I interrupt for a second?
A Sure.
Q You said March, was that 2014?

A Yes.
Q Okay.
A His client was interested in purchasing a first deed of trust secured by at that time somewhere between 36, or 33 and 36 buildings in Baltimore City. They were, with few exceptions, residential properties. He did not identify to me who his client was. So I initially sent off a representation agreement to him.
Q Would that be the representation agreement that has been marked as Exhibit 2?
A No.
Q No?
A I don't believe. Let's see.
Q And the reason I ask --
A I'm looking for a signature.
Q -- is the typed -- on the signature page it has the name Rongtao Xu and not Sean Leonce.
A Ah, okay. Well, Mr. Leonce occasionally partnered up with various people. In this particular transaction his partner was a fellow by the name of Rongtao Xu. And I suspect that since

Mr. Xu was Chinese and ultimately I found out that the purchaser, would be purchaser, was Chinese, I made the assumption that the link was there, Leonce found Xu, Xu found Cindy Tao, and that's how the connection was made.

But Cindy Tao, the name Cindy Tao, was not introduced to me really until I think a deal had been struck between the then owner of the note, a fellow by the name of Ben Maldanado, and this group. Leonce was the one I believe taking the lead in that negotiation.

So a deal was struck, I was contacted, he said, all right, we've got a deal, draw up the paperwork.

Q Who contacted you at that time?

A Leonce, Leonce. Do the paperwork. And I said okay.

I made the assumption, because, again, little was revealed to me as to who the buyer, if you will, of this note was, so I made the assumption it was Leonce and/or Xu, and I typed on the representation agreement Xu. That's the best

information I had.

Once it was typed and done, arrangements needed to be made to have an earnest money deposit, initial deposit, sent to me and be held in escrow. I think it was $10,000. And at that point I asked Leonce, I said, where's the money coming from, I mean, is it coming from Xu, you, who?

Q Very poetic.

A And he said, no, it will be coming from a lady by the name of Cindy Tao. Well, is she the group, is she -- what do they call themselves, you know, now that we're on the topic. And he identified, I think he identified at that point the name of the group. Although he may not have, to be honest with you.

Q But he did identify Cindy Tao?

A He did, he did.

Q Okay. At that point did he identify anyone else with Cindy Tao?

A No.

Q Okay.

A So he identified it, we gave them wiring instructions, a $10,000 deposit was made to be held in escrow as a good faith deposit.
Q Do you recall who wired the $10,000 in?
A No.
Q Okay.
A I don't.
At that point, the -- when I say the deal had been made, the -- I think to the extent that a purchase price was agreed on. But there was, you know, certainly a lot of due diligence items that the deal was subject to. There was a dearth of relevant information as to the properties. The addresses were there, although I believe two or three of the addresses out of the 36 were really no longer part of this package in that they had been lost to tax sale.
Q Let me slow you down, because I'm really trying to get an understanding.
So, moving backwards, Cindy Tao identified herself. Do you recall whether this retainer was signed prior to or after the money

was wired to you?
A I think it was after.
Q All right, fine. And you mentioned Sean Leonce. Do you still represent Mr. Leonce?
A I do not.
Q Okay. All right, I apologize, I just had a couple of questions. If you can --
A It's okay, it's okay.
Q -- continue. You were discussing about the properties and several had, you believed --
A Yes, there was due diligence to be done, so the contract essentially was subject to due diligence.
What I got I think were the parameters of the deal verbally from Mr. Leonce, and then I was given the task of drafting a contract, which, you know, I drafted based on the instructions I had. And I think -- I think almost simultaneously I knew enough at that point to put together a representation agreement as to what the heck I was going to be doing.
Q Was there a subsequent representation

agreement, was there a subsequent representation agreement put into place?
A Actually, I don't remember.
Q Okay.
A I don't remember the -- this transaction seemed to adapt or readapt itself to what it was going to be as more facts became known, facts that were relevant to the security for the first deed of trust, the properties.
Q Is that information you learned yourself when you were doing due diligence?
A A lot of it I did learn myself, yes.
Q And when you learned this information, with whom did you communicate?
A I communicated with Leonce. Actually, there were a number of joint emails in which -- and/or conference calls in which Leonce and Rongtao Xu, Cindy, who had been identified to me. There may have been one or two others, honestly.
Q Do you remember if Nina Huang --
A Who?
Q Nina Huang, H-U-A-N-G, was on any of

these calls?
A At some later point.
Q Later point?
A Meaning -- this was going on, I believe, from late March of 2014, and the deal closed insofar as Mr. Maldanado getting paid probably sometime in May of 2014.
Q Do you remember when you first --
A I'm getting there.
Q I'm sorry.
A I'm almost trying to remember and talk at the same time, which is --
Q Sure, please continue.
A -- something Gerald Ford didn't do well with.
I think I met Nina during that summer of 2014. I did. Ms. Tao invited me to come to her office, which was in Tysons Corner, Virginia, or someplace close to it, to meet and to talk about the deal and to have lunch. And it was at that point that I met both Cindy Tao and Nina.
Q Was this before or after the contract

was signed?
A After.
Q Okay. And is this the first time you had met Nina?
A That's correct.
Q Okay. Is it the first time you had spoken to Nina?
A Best of my knowledge, yeah.
Q Okay. You speak Chinese, right?
A I do speak some Chinese.
Q The reason I ask is most of the times Nina communicates in Chinese, that's why I'm asking.
A Correct.
Q Okay. You can continue.
A Okay. So I meandered all over the place. I think your question, the last question which sent me off into the woods was what my job requirements were at least initially. Fair enough?
Q Initially. And you also -- the reason I let you continue is you're going to save a lot of

time because you filled in a lot of pieces in terms of timing, which is where I'm trying to get.

A Understood.

Q So if you want to continue with the narrative, it is helpful.

A Okay. So once I knew enough about what was being purchased and the general terms of the deal, I felt I had enough information at that point to draft a representation agreement, which is here today as Plaintiff's 2.

Q Okay.

A I then set about the task of doing several things, actually. It was to make a determination, number one, as to the financial slash legal status of the remaining properties in this package of properties, which I believe at that point had been 33. And what that means is that we had to get lead sheets for 33 homes, we had to find out what municipal charges were assessed against each of these homes.

Q Now, was this done after the contract was signed during the due diligence period?

A During the due diligence period.
Q All right.
A And the seller, Ben Maldanado, had represented to Mr. Leonce, and I have no idea what he represented to Ms. Tao, but he represented to Mr. Leonce that, yes, there was approximately $200,000 in city liens currently against the property, liens for unpaid property taxes, unpaid water bills, unpaid city violations of various sorts.
So when the deal was negotiated -- and again, I did not -- I was never involved in the actual dollar negotiations. There was an awareness, I was aware that there was an awareness that there was moneys due the city, and it was represented to be about $200,000.
I set about the task of getting lien sheets, and also I set about the task of seeing which of the properties, if any, was the subject of litigation.
Q Could you define what you mean by lien sheets so it's clear on the record.

A Sure. In Baltimore City, as happens in a number of counties, in order to -- well, typically, typically in order to convey property, that was not the case here, but in order to convey property one must get a piece of paper which is called a sheet, lien sheet here, and on that paper the city is telling how much money is due the city for various things that the city charges for, property taxes, water bills, citations, et cetera.

So the best way to find out in one spot what is owed on a property theoretically is with a lien sheet. I say theoretically because as a practical matter the lien sheets very typically are not accurate if there are outstanding bills that haven't found their way to wherever it is that the city stores that information.

So one may see 2 or $3,000 in aggregate bills or costs against the property, but in reality when one goes to pay them for the purpose of recording a deed, one could very well find out that, no, it's not two or three, it's about seven. Why? Well, because there's city charges for going

by and boarding up a house that just didn't find its way there.

So it's imprecise at best.

Q So the lien sheet is a condition of recording a deed in Baltimore City?

A It is a condition of recording. But again, its use, and certainly in terms of this situation, was to try to verify that the representation of $200,000 in debt to the city was accurate.

Q Do you recall what you found when you got your lien sheets and reviewed them?

A Yes. I recall that at the time we did that, I guess, oversight work, due diligence, we found debt that -- we found charges due to the city well in excess of over $300,000. And it was not a static number.

The way it works in this city, if you have, for example, a citation because you had trash in your rear yard, the citation is $50. But if you don't pay it in two weeks, it becomes $150. And if you still don't pay it, it becomes $500,

and then it becomes $1,000. So it ends up being exponential.

Water bills just tend to generate penalty charges. Property taxes tend to generate, I guess, additional interest.

These properties, I think, in total had not had many, if any, municipal charges paid in several years.

Q And municipal charges, you mean like water bills?

A I mean water bills and --

Q Lien and clean, it's -- I call it lien and clean, it's for working, do you consider that as a municipal bill?

A It is, it is, yes. It's charged -- it actually becomes a lien against the property.

So it appeared that several years had elapsed where these charges weren't repaid.

And at the same time we noted that a number of these properties were in tax sale. And what that means is that because municipal charges had not been paid, the city, places, properties

with delinquent charges into a sale of the tax certificates, the right to buy what the city was owed. And typically it happens, I believe, in May of every year.

So we found a number of these, perhaps a half a -- no, perhaps a dozen, perhaps more, that were in tax sale.

Q When they're in tax sale, there's still a right to redeem them, there's just additional cost, correct?

A That is correct.

Q And additional costs would be legal fees possibly if it was sufficient amount of time between tax sale and --

A Well, it would be legal fees if, in fact -- if, in fact, a complaint was filed with circuit court. Law prohibits or regulates, let's say, the amount of legal fees that can be charged prior to a complaint being filed.

So we found a number of these were in tax sale. A couple were in receivership or pre-receivership. What that means is that there

were code violations on certain properties that the city had determined were significant enough and had not been addressed that required the city to essentially tell the owner you will either fix this or we will take it from you, you will no longer own it, and whomever it is that ends up with it, they'll fix it.

Q So that would divest title to that property and the entity purchasing the note would have lost that as security, correct?

A Correct, best of my knowledge. There was only a couple that were in receivership, and I believe we were -- we were able to address that fairly quickly and the receivership cases were dismissed. Whatever it is that the city wanted, Ms. Tao's management company, I believe, did it. So that part of it was fine.

Q Well, now, in terms of the receiverships, this was taken care of after the due diligence and the purchase --

A That's correct.

Q -- agreement went through?

A That's correct.
Q Okay.
A The due diligence period consisted of getting, I guess, a place in time. What this package of properties, what -- I guess, what debt and/or legal issues were outstanding as of a place in time, place in time being approximately at the time of the closing of the transaction.
Q Do you recall that after the due diligence period the price was reduced from 750,000 to 660,000?
A Yes.
Q Do you recall why there was a price reduction?
A I really -- I can't tell you why because I don't know for sure. I can just tell you that I turned in a 40-some page report.
Q We'll get to that.
A I understand.
Q Let me follow up my question. Were you involved in negotiating a price reduction or suggesting a price reduction to the client?

A I was not involved in negotiations. I did suggest to my client both with the submission of a 41 or 40-some page study as well as one or two telephone conferences with a number of people on the conference line suggesting that there's more owed than was represented initially, and that effectively you're going to be paying more for this than you anticipated because there's more debt than you anticipated.

Q Do you recall whether the fact that a determination had been made that some of the properties had already been lost through tax sale had occurred?

A Well, yes, I remember, at least I think I remember, that initially I think there were 36 properties.

Q Okay.

A And at the end of the due diligence we saw that three were just gone.

Q Okay, that's consistent with my understanding. I'm just trying to fill in pieces as to why the 90,000 price reduction was agreed

to, whether it was because of the additional costs you just described, because properties were lost, or a combination of both. You don't know?

A I don't know. I was not privy to that conversation.

MR. KIRSCH: Can you mark this as 3.

(Politzer Deposition Exhibit 3 was marked for identification and is attached to the transcript.)

(Discussion held off the record.)

BY MR. KIRSCH:

Q I've shown you what was marked as Exhibit 3. Can you identify this document?

A Yes. This is part, I believe, just part --

Q Part?

A Well, I'll explain that.

Q Okay.

A I could be wrong.

Q Well, if you can identify -- I'm sorry, please continue.

A I wrote a report that probably exceeded

what we initially anticipated as just a due diligence report. A due diligence report, a typical due diligence report that I would do would say this is the current situation, the financial situation, with the property, it has a lien on it or city violation, and it wouldn't go much further than a check of whatever potential financial obligations were attached to a specific property or, in this case, a package of them.

This study went way beyond that, because in all honesty this package of 33 houses was clearly a troubled package of properties in that there were issues of nonpayment of city liens, there were issues of property in various stages of disrepair, there were issues of non-collection of rent, there were issues, I believe, in one or two cases that the gas and electric company had to actually turn power off to a couple of buildings.

All of the issues stem from the same root cause, and that cause was that this package of properties was owned through several different corporate entities, but the owners of that entity

were just two people. One was Robert Griffith and, to be honest with you, the other guy I don't remember, he was never involved personally because I think he'd already gone bankrupt.

Q Does the name Matthew Hormung, does that --

A Matthew, I'm not sure "Hormong."

Q If you look at number 4 of your report under assets.

A Hormung, Hormung. Yes, "Hormong" had me thrown.

Q Sorry for the pronunciation.

A In some cases it makes a difference.

Q Yes, sir.

A Yes, these two gentlemen owned the properties. They purchased -- let's see, what did they purchase. They purchased the properties from, I believe, a nonprofit group that had had them for a number of years. Griffith and Hormung sought to refinance the properties and ostensibly get enough money to not only purchase them but also to renovate all of them to bring them to

current market conditions. They purchased them. We saw very little evidence that they had put any money into the properties vis-a-vis repairs.

So what they were doing essentially in the trade, it's called they were raping the properties, whatever money that they could extract from the tenants they did, and whatever work that the properties required and/or whatever expenses that the properties generated, they tended to minimize whatever they paid there.

So as I saw in many, many cases at the 33 properties that large debt was owed, some were in tax sale, some cases the tenants had no utilities, no heat, no water. How did I know that. I knew that because an individual that had done work for me from time to time, I retained him to go to each property and give me a report.

Q Do you recall who that individual was?

A Yes, his name is Gerald Dixon.

Q Okay.

A And he'd worked for me for 35 years. I was in the real estate business at one time.

So he went to a mall to find out what we had, and the story came back very similar. Apparently, Mr. Griffith was the party of the two that was actively involved with these properties, but my understanding was that Mr. Hormung was no longer physically involved. I never had a conversation with him, I never interacted with him.

So we understand that the rent was paid by requirement of Griffin in cash. Mr. Griffin had individuals that literally on the first of the month would go to the properties and have the tenants pay them in cash.

So I wrote this report, and the purpose of the report was to do two things. It was to document financially what kind of costs there was going to be to free up the property from city liens. There was absolutely no way for me to determine what the cost would be to renovate the properties to bring them to market condition. That would have involved more than, much more than a cursory check of the properties. But at least I

got a thumbnail from the report handed in by Dixon, it was mostly to be a verbal report to be honest with you, that all needed some degree of work.

So I wanted to present a picture to my client, which at that point was Baltimore -- what is it, Baltimore -- I get it confused.

Q Baltimore -- would the name Baltimore Harlem Park Investment --

A Yes, Harlem Park. Where Baltimore came from, I don't know.

Q Or as you guys say, "Baltimore."

A Well, you should. Well, I take it you're from New York, so --

Q I say "Baltimore."

A You've adapted?

Q We grow, don't we.

A All right. Anyway, I wanted to present as clear picture as I could to what this investment was going to be, and at the same time I wanted to present to the best that I could in terms of looking forward what upside potential the

properties had, presuming the money was pumped in to free them up from liens, presuming the money was pumped in to address the physical problems of the property and that the property be managed properly and legitimately.

So here's what it is now, here's your snapshot in time, and it's not a work of art, to say the least. But here's where it could be if the project is undertaken sensibly and done in a professional manner, knowing going in what you've got to do.

Q Now, initially you said this was part of the report.

A Yes. I thought that I included pictures, I could be wrong.

Q Okay.

A I mean, if there's a page that says it's included -- yes, there you have it, that would be a conclusion. So maybe that was it. I just don't remember whether I turned in the pictures.

Q Okay. Let me ask you a few things about this report just to confirm.

A Sure.
Q This report was done during the due diligence period under the contract, is that your recollection?
A That is my recollection.
Q Who asked -- did anyone ask you to prepare this report?
A Nobody specifically asked me to prepare a report that ended up being this report. I was asked to do due diligence.
Q By whom?
A Sean Leonce. I just felt that because of the nature of the properties I would be remiss if I just threw some statistics on a piece of paper.
Q Okay. Page 1, I'm not going to go through the whole thing, but do you recall, did you actually review -- excuse me, page 1 and 2, did you review the items 1 through 7 which would have been mostly the underlying loan documents, do you recall whether you reviewed those documents?
A I did.

Q Okay. Now, if you go to page 31 you have subsection C, I would call it a conclusory provision, where you talk about really what money it's going to take the venture to really be able to buy these assets. Is that a fair assumption and characterization of what C is?
A With your permission, give me a minute to read it.
Q Sure.
A Okay. And your question again?
Q Basically, you come to a conclusion, seems to be a conclusion that you said it's going to at minimum take a million 50 to get the project to where it should be in terms of buying the assets, paying the taxes, and the rehab.
A Minimum.
Q Minimum. And then if you go later on in the last conclusory paragraph you say it could easily be 200,000 more in rehab.
A Correct.
Q So this was pretty much a -- as you -- for lack of a better word, it's a moving target.

And this is consistent with what you testified to earlier, that you really couldn't fully understand everything because of lien certs and you didn't know the conditions of the properties, and this is a best estimation, but at minimum, a million 50.

A Minimum, a million 50. The term "moving target" I believe is very accurate.

Q Okay. In fact, even on your numbers -- Ben would be Ben Maldanado; is that correct?

A Yes.

Q He actually was paid 60,000 more than that, so already you're over 1.1 million.

A Correct.

Q Okay. Now, after this report -- and it's really not an opinion letter, it seems to be a summary, it seems to basically address, as I see it, everything, from -- it's a little bit of everything --

A Yeah.

Q -- a little bit of background and you're trying to, like, educate. It seems like an education piece, that's the way I look at it.

A That was my point, I wanted my client to have as much information as they could.
Q Right. After this was produced you sent this off to several people, correct? Do you remember if you sent it to Sean Leonce?
A Yes.
Q Do you remember if he sent it to Rongtao Xu?
A I have no idea what he did with his copy.
Q Did you send it to Cindy Tao?
A I believe so.
Q Did you send it to Nina Huang?
A At that point, at that point I had no knowledge --
Q Of her?
A -- that Nina existed.
Q Okay, that's fine.
Moving forward just a little, it's a little out of context, did you have any discussions with Cindy Tao about how the initial purchase of the assets would be funded? Were you

involved in those discussions with Cindy Tao?
A No.
Q Did you have any discussions with Cindy Tao in terms of how this project had to be capitalized, other than giving her this due diligence report?
A No.
Q Okay.
A No discussion as to the finance.
Q Okay. I'm just going to show you this and we're going to discuss this. Could you mark this as the next exhibit.
(Politzer Deposition Exhibit 4 was marked for identification and is attached to the transcript.)
Q I'm going to show you what's marked as Exhibit 4. This is a legal bill, and I'm just going to ask several questions.
Can you identify this as a legal bill generated by your offices for services and costs related to the Baltimore Harlem Park Investment, LLC, project?

A Yes, that's a fair characterization.
Q Is this an accurate statement? This is for services rendered and fees incurred, costs incurred for the period of March 29th, 2014, through August 6th, 2015?
A That's correct.
Q Okay. And if you go to the last page, the total services and expenses were close to $76,000, correct?
A That's correct.
Q Okay. And this shows that for this period of time, is it a fair statement that you had an extensive involvement in this project? It's not one of those deals where you set it up and you walked away. If you want to look at the bills, it seems that for the period of time --
A No, I think it's a fair characterization that I continued providing assistance as needed beyond the closing of the deal.
Q Can you look at page 2, starting with the July 15th bill. Well, let's go to the first page. All of the client's name on the first page

is Harlem Park, correct?

A Yes, sir.

Q Looking at the second page and continuing to the third and fourth page, the client's name was changed to Cindy Tao starting on July 15th, 2014. Do you know why that change was made on your records?

A I do. It was an error on our part. As I said, the accounting system that we had at the time was fraught with problems. The system that we used was really set up to name clients as individual names, that's how things were referenced, and if the client was Baltimore Harlem Park but the individual that we were interacting with or, more relevant, the individual to whom we were looking for payment, we would characterize it that way.

So the reality is that the client always was Harlem Park. Cindy Tao individually was never a client, we performed no services for her other than those that were related to Baltimore Harbor Park.

Q And that was going to be a follow up. So your testimony, as I understand, is Cindy Tao was never a -- personally was never a client of your firm's?

A That is correct.

Q Do you know who William Weiss is?

A That is her husband.

Q Was he ever personally a client of your firm?

A I'm sorry?

Q Was he ever personally a client of your firm?

A No.

(Politzer Deposition Exhibit 5 was marked for identification and is attached to the transcript.)

Q I'm going to show you what's been marked Exhibit 5. Previously you referenced a purchase and sale agreement. Is this the agreement you were referring to that you had prepared for your client?

A Yes.

Q Now, with regard to Baltimore Harlem Investment, LLC, did you prepare -- I'm sorry, are you still looking at that?
A No, no, I'm done.
Q Did you prepare the operating agreement for the Baltimore Harlem Park Investment, LLC?
A No.
Q Did you ever review it?
A Never was presented with it.
Q Okay. Now, based on your legal bill, which has been attached as Exhibit 4 and, I believe, your testimony that you did have ongoing involvement in this project. Now, the project, I believe you'd also testified that the contract, the project came to fruition in May of 2014, correct?
A May of 2014, I think that's accurate.
Q And after that point did you continue with your work dealing with all of the problems related to the properties?
A I did.
Q Did there come a time when you retained

Attorney Alan Fink?
A Yes.
Q And what was the purpose of retaining Alan Fink?
A Well, the purpose of retaining Alan Fink was the basis of this deal, if you will, was the first part, of course, purchasing the first deed of trust and the note, and then the ultimate plan, which is what I believe was the plan, wasn't my plan, necessarily, but it was the plan of the owners, was to foreclose the properties. The debt was, my God, at least in default by four years, perhaps more.
The plan was to foreclose all of the properties and then purchase them, which, at that point, so it would be a foreclosure, the properties would be purchased free of any secondary or third loans against them. City liens of sorts had to be paid, but there was to my knowledge a second mortgage covering these properties and very likely a third.
So the plan was to foreclose. If any of

the properties at foreclosure auction brought a price that in the opinion of the -- of my client, the owners, that it was better to take the money than bid and own the property, then they would do that.

Q Meaning they would sell the property at the foreclosure sale at the courthouse to a third party?

A Yeah, yeah, unless -- again, the strategy was win, lose, or draw, we're going to foreclose, because at this point all we have is a note that's not being paid.

Q When was that decision made to foreclose?

A Well, I think a decision was made -- and again, I don't have direct knowledge, but I think it was part and parcel of the decision to buy this note.

Q Did you discuss the foreclosure process with any of the members or principals, officers of Baltimore Harlem Park Investment?

A Yes.

Q Do you recall with whom you spoke?
A Yes. I attended a meeting with Mr. Fink, I think in the latter part of summer 2014. And the purpose of the meeting was to explain the foreclosure process.
Q Now, you had been involved at this point since March. Between the March period and now this late summer, which you believe was July, do you recall whether you had any concerns regarding the capitalization of the company or undercapitalization of the company at this point?
A I didn't have concerns because I had no idea what the capitalization was. I was never privy to that at all.
Q So none of the members had provided you with any information as to what the capitalization had been at that point?
A Correct.
Q Sitting here now, do you know what the capitalization of the company was in July?
A Honestly, I don't.
Q Do you recall ever having discussions

with Ms. Tao about the capitalization of the company?
A No, I don't.
Q Well, later on in the process, in late '15 and into '16, you were aware that the company was seeking financing to purchase the properties, do you recall that?
A In September, I think it was September of 2015, I think that's when we finally had cleared up to that point the properties from tax sale and from water bills, and at that point in September 2015 I believe we did foreclose the properties.
Q Now, is it your recollection that all of the properties or just a list of certain properties were foreclosed upon?
A They were certain properties, there were a total of 15 that were foreclosed upon.
Q Would 17 be a number that might -- okay, it doesn't matter, you think 15?
A 15 for sure.
Q But substantially less than the original

portfolio?
A Substantially less, that's correct.
Q And why is that?
A We were directed to a specific list of properties that the client wanted foreclosed.
Q When you say directed, do you recall who directed you? Was it Frank Gavern who directed you?
A No.
Q Was it Cindy Tao?
A It was actually -- I think it was actually Nina who had made that determination.
Q Well, when you say determination, are you saying to your knowledge she made the determination or she gave you instructions? Big difference.
A I believe I got the instruction from Nina.
Q You got the instruction. Do you know how the determination was made, who made that determination?
A Nina made it.

Q Made the determination?
A That's right.
Q How do you know Nina made the determination?
A Because she had been in the process, I assume, of coming up with some sort of a financial plan or financial picture. So she grew more active as time went on to try to determine what properties she felt were worth keeping and what properties she felt were not worth keeping.
Q Were you involved in that decision-making with Ms. Tao?
A I was involved to the extent that I provided information that she requested. I did not, to the best of my knowledge, make any specific recommendations and say this one's a good one, that one's a bad one.
Q Were you involved in any of the discussions that occurred between Ms. Tao and Ms. Huang regarding the determination of which properties to go to foreclosure on?
A To the extent that during the several

meetings I attended in Ms. Tao's office in Tysons Corner, or wherever it was, in those meetings it was typically myself, at times Mr. Fink, but always myself, Ms. Tao, Nina, the property manager, Frank Gavern. There was a young man whose name was Cody, I don't remember his last name.

Q Do you know who Cody worked for?

A My understanding was that he worked for Ms. Tao.

Q Who told you that?

A Well, I was introduced to him by Ms. Tao.

Q Okay.

A It may have been an assumption. Cody's duties during these meetings, I believe, was to translate to Nina anything that was said in English. Based on her responses to Cody in Chinese, it was clear to me that she understood what was being said.

Q Were you involved in any discussions between Ms. Tao and Ms. Huang as to how it was,

discussions regarding why Ms. Huang would be the person to make the determination of which properties to be foreclosed on?

A No, no.

Q So you don't know how it came to be that Ms. Huang was the decision-maker, correct?

A That's true.

Q Okay. That's what I was trying to find out.

A And for what it's worth, I learned Chinese because I did business in China, it was real estate development, and that business operated successfully for about ten years. I did a lot of negotiation as part of that business, I was buying and building, we would call them condos, they call them apartments.

So I got to learn the nature to some extent of how Chinese people or how that culture conducts business. And in a nutshell, information is held very close to the vest, you never know who is the real decision-maker. At least that was -- that was how it worked for me in China, and it

didn't -- number one, I never questioned it in Baltimore. But not knowing who the real decision-maker was was not something that I found extraordinary based on my experience.

Q Well, are you saying you didn't know in the Baltimore Harlem project who was the ultimate decision maker?

A Not -- not -- I mean, initially the only person I knew was Cindy. It was when I attended a lunch in that summer of 2014 that I first met Nina, who was introduced as a partner and a friend of Cindy's. That's the first time I ever met Cindy. But the relationship, the specific relationship between them, other than the word "partner," was never explained to me.

Q So just stepping back to what you said, what you said earlier, is it your recollection that Ms. Huang, Nina Huang, had nothing to do with presenting this project initially to Cindy Tao?

A That Ms. Huang --

Q Did not present the investment opportunity to Ms. Tao. Do you have any facts or

know anything that would lead you to believe --
A I didn't even know she existed.
Q All right. During the course of your work did you ever come to understand who was the true decision-maker, or was it always vague and you never sought to seek that information out?
A Honestly, it was -- it was vague.
Q Okay. That's fair.
Okay, let's get to the period in late 2014. Did you become aware that a new set of investors were brought in?
A Investors were brought in.
Q Does the name Dongyun Mao or Ting Tang or Mary or David mean anything to you?
A Yeah, I don't -- I honestly don't know that it was late 2014 or 2015.
Q Well, if I were to say December 2014, which --
A I would say it's possible. I met -- I met a number of people from time to time when I was with Cindy. They weren't really -- I'll tell you the truth, they weren't introduced to me as,

well, this is one of my partners. The only person that was introduced in that manner was Nina. The other people would be introduced as being interested in Baltimore real estate and not much more specific. I don't think I was ever told, well, this is Mr. Ting Tang and he has invested X dollars.

Q So you sitting here now, do you know that Mr. Tang and his wife, Ms. Mao, invested $300,000 into the --

A I don't know that for a fact.

Q Okay.

A I read the complaint, but beyond that, no.

Q So you had no involvement in soliciting --

A No.

Q During this period of time in late 2014 or early 2015, did you have any discussions with Ms. Tao about the need to raise additional capital?

A I told her that the expenses were going

on, that we -- I told her that the properties needed to be foreclosed and work on a property-by-property basis had to begin, because the status quo, as it was at that time, was doing nothing except generating additional expense.

Q Do you recall how Ms. Tao responded?

A That she understood.

Q Okay. Let's go back to the foreclosure. There did come a time when certain properties were foreclosed on.

A Yes.

Q 15 properties, let's use your number. And am I correct that you were appointed as the substitute trustee?

A Yes.

Q And then Alan Fink drafted the complaint and his office handled the foreclosure?

A Yes.

Q And there was a public sale, correct?

A Yes.

Q And all the properties identified and then went to sale were, in fact, bought back by

the lender?
A I'm sorry.
Q Strike that.
Are you aware of a company called Baltimore NDC Asset, LLC?
A Yes.
Q And are you aware that a company was set up to purchase the properties in foreclosure?
A Yes.
Q Were you involved in drafting that document?
A I very well may have been.
Q Okay. So going back to the foreclosure, there came a time when there was a public foreclosure and, in fact, none of the properties went -- none of the properties were purchased by any entity under the Baltimore NDC Asset, or Baltimore Asset NDC, I forget the full name.
A As I understood.
Q And that is the company that's actually owned by the same members as Baltimore Harlem?
A That was what was represented to me.

Q So in a sense the lender took back. There might be an additional step, but it was analogous that the holder of the note ended up taking the properties back?
A That was -- that was my understanding.
Q And do you recall at that time, was a $5,000 deposit provided for each of the properties?
A Yes.
Q Okay. And that property -- that money would have been given to the trustee, and that would be you, correct?
A Actually, the money, the deposit was held in the trust account of Mr. Fink.
Q Why is that? And I'm not making a big deal, I'm just asking.
A No, no, that's -- that's fairly typical.
Q Okay. Do you know whether the money is still there?
A I know that -- I don't know that it is there.
Q All right, let's continue with this. So

in terms of the sale that was conducted, do you recall when the sale was conducted?

A I believe September of 2015.

Q Okay. And do you recall that there came a time around December of the same year that the court ratified the sale?

A That is correct.

Q And at that point after ratification, is it correct that the parties then have a period of time, which is usually 10 days, to purchase the property?

A The auction contract stated that I think 10 days after court ratification the properties were to be purchased.

Q And that oftentimes in your experience many times third-party purchasers take more time?

A That's correct.

Q All right. And also, it's your recollection that the purchaser of the property in addition to paying the price that they bid on, they are responsible for all costs that accrue as of the date of the foreclosure sale at the

courthouse, correct?
A That is correct.
Q And they as buyers would normally be responsible for the recordation transfer taxes to get the property on record?
A Yes, all expenses of sale.
Q And then in this case because of the identity of interest, in order to get a property on sale that the -- all of the liens both pre- and post-foreclosure would have to be paid, the lender would have to pay the presale costs and the buyers pay the post. So the parties would then essentially be paying everything to get it on record, everything that's owed to the state, everything that's owed to the city.
A All right, I'm going to ask you to do that again.
Q What I'm trying to get at is we established that essentially there's an identity of ownership between the Baltimore NDC purchaser and the holder of the note.
A That's my understanding.

Q And because of that, irrespective of the memo, the parties who we're talking about would have to pay all of the liens against the property, both pre-foreclosure, post-foreclosure, the seller, holder of the note, would pay the pre and the buyer would pay the post.

A That is an accurate assessment.

Q So essentially there was no savings by doing the -- by setting up the third party there was no savings for any of the city liens, it was done simply to wipe out the subordinate liens.

A That's correct.

Q Okay. So December rolls around and the properties have been ratified. Was a title company retained to handle the settlement in the December period?

A A title company was retained, but not by myself nor Mr. Fink. It was a title company that I assume the ownership of the purchasing entity engaged.

Q And so you had no involvement in selecting or --

A I did not.
Q Do you recall, sitting here, who the title company was?
A Honestly, I do not.
Q Okay. Now, going back, actually, in terms of the ownership of Baltimore NDC, were you aware at some point that Sean Leonce and Rongtao Xu were no longer considered members of the limited liability company?
A I was aware of the fact that at some point an agreement had been reached between the company in Baltimore, Harlem Park or whatever, and those two individuals, who I gather had gotten some -- some small percentage ownership as compensation for their finding the deal.
Q And you had no involvement in --
A I had no involvement in that.
Q Okay.
A And I was aware of the fact that they were no longer involved at some point.
Q And during this period of time, we're now saying, let's continue with the December 2015

period, are you still representing Sean Leonce?
A No.
Q Okay. So let's go back. So now we're in December. Your recollection is that the purchasers of the properties, the Baltimore NDC entity, picked the title company and, based on your experience, that's a normal procedure, that the buyer --
A Typically the buyer selects one, yes.
Q Okay. Were you at this point having continuing conversations with any of the members of the Baltimore Harlem or the Baltimore NDC ventures about the properties they bought at foreclosure?
A At that point, meaning subsequent to the revocation in December of 2015, then and beyond I think my discussions with Baltimore Harlem Park were limited to discussions with Cindy Tao.
Q Okay. Just out of curiosity, is Alan Fink affiliated with Cohn, Goldberg & Deutsch or is he by himself?
A I think he's of counsel.

Q Okay. So that is the only Fink I know.
So your discussions were with Cindy Tao. Did you have discussions with her about funding the proceeds needed to purchase the properties?
A No. My discussions with Ms. Tao largely were to emphasize to her that the court regulates a foreclosure, the rules as to who does what when are a function of the rules, Maryland state rules and to a lesser extent local rules, and that the time had come and gone to -- you know, to effect the settlement of those properties. And it was my concern that the court would begin to get anxious that why isn't this thing being settled.
So the extent of my conversations are when do you think it's going to settle.
Q And these were discussions with Cindy Tao?
A I'm sorry?
Q These were discussions with Cindy Tao?
A Yes.
Q Okay. Based on the documents, it appears settlement did not occur in the December

period and that you made an extreme effort to have settlement done by June 30th of the following year, June 30th, 2016. Do you recall that?

A Well, let me back up just a little bit.

Q Sure.

A After several conversations with Ms. Tao earlier than that, saying, listen, what is holding this up, and then I was directed to contact the title company that was engaged to do this.

And when we contacted them it was apparent that they had no familiarity whatsoever with settling properties in Baltimore. Things that are fairly typical of Baltimore but atypical of almost anywhere else, such as ground rents, they weren't familiar with. They just had no idea what they were doing at least when it came to settling a property. They just couldn't seem to get a handle on it.

So at some point, perhaps March or April, I suggested to Ms. Tao that this title company did not appear to be making any progress in terms of moving this thing to a settlement, and

would she consider retaining a different title company, a Baltimore-based title company. And she said sure.

So I asked Alan Fink if he was familiar with a title company, I don't do title work, if he was familiar with a title company that could perhaps do this work. And he did, he did come up with a title company. Honestly, I know the gentleman who owns it, I know his name, I don't remember the title company.

Q Do you remember the gentleman's name? What is the gentleman's name?

A Serio, it's Jack Serio.

Q Jack, spell that last name.

A S-E-R-I-O.

Q Okay. And so the file was transferred to Jack Serio's company?

A I'm sorry?

Q Were the files transferred?

A Yes. And they did know what they were doing.

Again, the continuing problem of

properties going into tax sale because taxes weren't paid. They had been paid, they were paid in full as of the date of foreclosure, September of 2015, but they were paid in full through July 31st, 2015. So the taxes for the year beginning July 1, 2015, were not paid, they weren't anticipated to be paid until the property settled, which was supposed to be in December. But, of course, that didn't happen.

Serio's company diligently worked to getting the package of properties ready for settlement. It's my understanding that they were largely ready sometime in June. There was an imperative at that point, if it was at all possible, to settle them no later than June 30, because if they settled beyond June 30 the 2016-2017 property taxes would fall due and an entire year's taxes would be added to whatever the settlement costs were. So there was a very practical dollar reason to try to get it done in June. I don't know why it didn't happen.

Q Did you have discussions with Mr.

Serio's company about why it didn't happen?

A He didn't know. He didn't know. He -- I believe he -- I believe he communicated with somebody, whom I don't know, from Baltimore Harlem Park.

Q And during this time, which would be leading up to the anticipated June 30th, 2016, settlement date, did you have any discussion with Cindy Tao about settlement?

A Yes. I tried to impress upon her that, you know, we've come this far, it's about -- you know, we're almost where we really need to be after a two-year journey, but, you know, you're going to have to pay property taxes on 15 properties over and above, and if finances are tight that will just exacerbate the problem, so see if you can get it settled.

Q Did you have these same conversations with either Mr. Tang or Ms. Mao?

A No, no.

Q Did you have these same conversations with Ms. Huang?

A No.

Q That was no?

A That was no.

Q Okay. So settlement did not occur in June. As I understand it, another settlement was then set up for August of the same year, is that --

A That's correct.

Q Okay. And that would now increase significantly based upon the need for -- to pay the new year's taxes?

A It was a higher figure, that is correct.

Q Are you aware there's an allegation that Ms. Huang and -- excuse me, an allegation that Ms. Huang, Mr. Tang, and Ms. Mao refused to sign certain loan documents in August of 2016 that would have allowed a loan to be made to purchase the assets?

A I'm aware of the fact that whomever it was that was supposed to effect the purchase, and I think there was -- if memory serves me, Ms. Tao had arranged for a loan from a third-party lender

that would have provided sufficient funds to purchase those foreclosed properties. And Mrs. Tao was one but not the only signatory that was required on that loan.

It was my understanding that there was an agreement between her and others that I don't know who they were, she didn't mention it, that the settlement was going to proceed, the loan was in place, we just needed signatures, fine. The day of the settlement we had no reason to believe that it wouldn't settle. But it didn't.

Q Now, you said there was an agreement. Ms. Tao said there was an agreement in place to allow the loan to go forward?

A She said that she had located a third-party lender.

Q Okay.

A And the lender required that all principals who were involved in the purchase sign the loan documents.

Q And the principals, that would be the principals of the Baltimore NDC company?

A Yes.
Q Did Ms. Tao say that there was an agreement in place among these principals to take this loan out?
A No.
Q Do you know anything about the specifics of this loan in August?
A None.
Q Did you have any discussions with Ms. Tao after the August 30th, 2016, date passed about why the loan did not happen?
A Well, the settlement didn't happen.
Q Settlement, sorry.
A I did. I said what happened here, this thing was ready to go. It was my understanding that financing was in place and it was going to happen. And she related to me that -- she related to me that Nina refused to sign the loan document. She made no mention of anyone else.
Q Were you aware of the membership of the Baltimore NDC Limited Liability Company?
A Well, I suspect I would have had names,

because how would I have formed that company without --

Q Does the name Sea Source, the company Sea Source ring a bell?

A Oh, Seahorse or something?

Q Sea Source, I think it is.

A Something like that.

Q Or Wisdom?

A Yeah, that was -- yeah, there were -- I think this entity, NDC or whatever it was, I think it had two partners, and both of those partners were corporate entities.

(Politzer Deposition Exhibit 6 was marked for identification and is attached to the transcript.)

Q I'm just going to ask you to look at this, and my first question is before today have you ever seen this document?

A I have absolutely -- absolutely no memory of this whatsoever.

Q Okay. Well, if you can just keep looking at some numbers here.

A Oh, okay.
Q Were you aware at any point that as of mid 2015 or late 2015 that Ms. Huang had put in nearly $800,000 for her interest, whereas Cindy, which is referenced, which would be Pinehills, had only put in 164,000?
A I never at any time had any idea of who had put in what.
Q Okay. That's what I needed to know.
Going back to the foreclosure, is it your understanding sitting here today that the properties still have not been purchased?
A It is my understanding that the properties have not been purchased. And I will relate that the court has apparently reached the end of its patience, and they have provided a notice of contemplated dismissal of the foreclosure.
Q In fact, that hearing, I believe, is set for August 2nd?
A Yes, sir.
Q Okay. And if that was to occur, would

that effectively dismiss the foreclosure purchases that were made in September of '15?

A If the court is not persuaded to keep the foreclosure open and says, no, time's up, the foreclosure is a nullity, then the foreclosure would be a nullity.

Q And at that point the money would -- they would be essentially -- the foreclosures would be, I guess, deemed void and nunc pro tunc from the date of the actual sale?

A I'm sorry?

Q It would be deemed null and void as of the date of the sale, as if the sale had never occurred?

A Yes, essentially it would be that the purchaser defaulted.

Q Well, what happens to the money then? Would it go to the lender?

A Yes.

Q Okay. Have you had discussions with anyone at either Baltimore NDC or Baltimore Harlem Park about how -- what position to take at the

hearing on August 2nd?

A No. Both myself and Mr. Fink have put Baltimore Harlem Park on notice that there is a hearing to contemplate the dismissal of the foreclosure. And I think the most recent communication was within the last week to 10 days from Mr. Fink. I believe the communication went to Ms. Tao, likely went to one or two of her counsel, Tom Valkenet and perhaps Mac VerStandig.

Q Do you know if the notice was sent to Ms. Huang's counsel, me?

A I have no idea.

Q For the record, it's never been sent.

Have you received any instruction as to how to proceed then? Or if not, how are you going to proceed on the 2nd?

A Well, unless we are given instruction otherwise -- number one, I will not be at the hearing, I will be in Asia during that time. But Mr. Fink will attend the hearing. And it is our posture to explain to the court that the process of getting this to foreclosure has been delayed

due to litigation.

Q Okay.

A And that our understanding is that at least one part of that litigation may either be settled or nearing a settlement. And I'll certainly be happy to have you clear that up for me.

Q I don't believe that would be an accurate representation, I know nothing of that.

A There is nothing that's settled.

Q My understanding, the only settlement would be a small portion where Baltimore Harlem Park was apparently -- and I wasn't involved, but I've heard that there were settlement discussions with plaintiffs. But that would not generate funds sufficient, that would not really impact the ability to go forward, there was nothing as part of that settlement that I'm aware of that would impact and address the issues of moving forward on the foreclosure of properties. If you've heard something different, then -- I've certainly not heard that.

A I've heard almost nothing.
Q Right.
A So just so if --
Q If Mr. Fink wants to give me a call, maybe he needs to speak to counsel, including Mr. Valkenet, Mr. -- and Mr. Soto represents the Mao group.
A If you don't mind, perhaps I'll have him give you a call.
Q Please, please, that would --
A I don't think he wants to --
Q We're not -- no one I don't think is antagonistic and wants to do any damage to this part of the sale, so that might be helpful. Again, I can only speak for myself, I certainly would want to speak with him.
Now, let me ask you about these properties. Do you know whether they can still be purchased through the foreclosure process?
A It is possible that several of the properties have already had their tax sale foreclosure completed. I can't tell you with

specificity whether that has or has not happened.

I do know as a fact that there is one property that did complete the foreclosure process, but for reasons that I can't -- that I just don't know, the title itself has not changed hands, although the title should have. Once the judge signs the order, the very next thing to be done is to record the order, which effectively transfers the title.

Q That's just procedural then.

A Most likely.

Q Okay. I'm going to ask you if you know any of these people. Do you know who Brian Casey is?

A I do.

Q And do you know what his involvement was in this project?

A I do. In the initial days of this process, meaning probably immediately before the final settlement of the note, which would have been, I guess, in May of 2014, it was apparent that someone would have to, I guess, take charge

of physically restoring the properties so that they were saleable. You know, if nothing else, that they were at least compliant with city code.

That same someone could also get involved in preparing the properties for foreclosure, essentially, essentially the functions that are typically taken by a receiver.

Casey was known to me because his office was next to my office for seven or eight years, so I knew him. And I recommended him to Sean Leonce and, I suppose, to Cindy. And I said, you know, you're going to need somebody to step in and start cleaning up this mess.

So they met with him.

Q Who's "they," do you recall?

A I'm pretty sure Sean Leonce and I'm pretty sure Cindy. I have no idea who else.

Q Okay.

A And he was engaged effectively to function in the manner that a receiver would typically function, although specifically he was not -- this property was not in a receivership,

but he would carry out a lot of the same duties.

He and I, after he was engaged, had a number of discussions over various issues with the property, and it became apparent to me that he didn't quite understand that the entire point of the project was for the client, my client and his client, to gain ownership of the property by way of a foreclosure. He seemed to think that it was more of a traditional receivership situation where he would be retained by a bank to go in and clean it up and get rid of it.

So we had a number of conversations to try to clear that up. And my impression was that it never got cleared up and that what he represented -- what he began representing to Mr. Leonce and to Ms. Tao was not what I was telling him.

So I felt that it was important that they understand that there was a disconnect. After some due thought, they made the decision to terminate him.

Q Did you have any discussions with Ms.

Tao about terminating Mr. Casey?
A I didn't -- the only discussion I had, I believe, and it may have been just by email, honestly, was to point out my concerns, that he just didn't appear to be on the same page as to what they were looking to do.
Q Okay. And, in fact, Mr. Casey was terminated at some point?
A He was terminated.
Q Okay. Just, I'm going to ask you if your office has provided legal services to any of these entities. You already said no to Ms. Tao, you already said no to Mr. Weiss. Premier Realty, LLC?
A No.
Q Pinehills Properties, LLC?
A No.
Q Rongtao Xu?
A Rongtao. That's Rongtao Xu?
Q Xu.
A Yeah, I -- he sold -- having nothing to do with this, he sold a piece of property that he

had -- that he owned, and I drew up -- I believe I drew up a land trust agreement, I think he sold the property by way of the land trust.

Q Do you recall what time period that was?

A Probably sometime late 2014, maybe very early 2015.

Q Do you still do legal work for Mr. Xu?

A No.

Q Have you ever provided legal services to Ben Maldanado?

A No.

Q Did you ever provide legal services to Ruby Jude, LLC?

A I would say the answer to that would be yes, because Ruby Jude, LLC, was the entity literally that owned the first deed of trust.

Q Well, did Ruby Jude, LLC, have its -- did Rudy Jude have independent counsel at the time that the purchase agreement was signed to your knowledge, did they have legal counsel?

A It wasn't named. Whether Maldanado had counsel, I have no idea.

Q Then why do you think you provided legal services to Ruby Jude?

A Well, I guess derivatively, because the only asset that Baltimore Harlem Park had was the ownership of Ruby Jude.

Q So you're saying that once they purchased Ruby Jude, LLC, since you were representing Baltimore Harlem Park, you considered -- that's why you say derivatively?

A Yes.

Q Okay. But other than that, no other?

A No.

Q Just, again, to your recollection did you have any specific conversations with Ms. Tao about the undercapitalization of Baltimore Harlem, LLC?

A No, I did not.

Q Any conversations with Ms. Tao about the undercapitalization of Baltimore NDC?

A No, I did not.

Q Do you currently represent Baltimore Harlem Park Investment in any legal capacity?

A The only relationship I have right now with Baltimore Harlem Park is to communicate with the attorneys who are holding tax lien certificates who are in those instances in litigation. I have been asked a number of times by Ms. Tao and by one of her counsel to determine what it would cost to redeem certain of these properties.

Q Have you in response to this request or requests provided that information to Ms. Tao or her attorneys?

A Yes.

Q Okay. And do you know when the last time such a request was made?

A Two or three months ago.

Q Okay. Of the approximately 15 or so properties that were not foreclosed upon, do you have any oversight, do you continue to review the status of the 15 or so properties that were not foreclosed upon?

A No, my only -- my only involvement at this point is to -- when I'm instructed to

determine what it would cost to redeem certain properties of the 15, then I contact the appropriate attorneys and get that figure, I get a lien sheet from the city, I provide that information to Mrs. Tao, and that's where it stops.

Q Now, during the time that you were providing services, legal services, in the 2014-2015 period, who did you believe to be the managers of Baltimore Harlem, LLC?

A Once I attended a meeting in Ms. Tao's office, and this possibly could have been in the late summer of 2014 or perhaps a bit later. This was the second time I had met Nina. The first time I met her was the first time I met Cindy. But the second time I met her we were at a meeting, and I noticed that Nina had a number of documents in front of her that appeared to be accounting sheet numbers, and she was accompanied by this fellow Cody, whose job I suspect was to translate for her.

And it was Nina that, let's say,

dominated the meeting in the respect that she was the one that asked the majority of questions, not only of myself, but of Frank Gavern, who is the property manager. She made certain requests for additional information that I provided.

And from that point on, even though I did not have a dialogue with Nina, many of the, if not all -- well, let's just say many of the emails that were sent to Harlem Park, Nina was copied on.

Q Okay.

A And some of them, but not many, I sent to Nina in Chinese. I'll be honest, I speak it, I don't read it. I don't know how anybody can, there's 30,000 characters. But I had it translated by somebody that does know how to write it.

Because my point was I wanted to make sure that Nina understood what was being said. And I was not, certainly was not consistent, but I remember sending a couple, two, three, to her in Chinese. But it was usually -- the point of those emails was to be responsive to her questions.

Q Do you have any recollection of the type of questions Ms. Huang asked? Were they financially, were they financially --

A I think what she was after was, I mean, at that point there were 30, 33 properties, and some of the properties were in such bad shape physically that it made little sense to try to retain them. There was an ongoing and somewhat long discussion over months which of these 30-some properties made financial sense to retain and therefore include in the foreclosure and which it made no sense to keep, in which case they were the note holder, they had no responsibility to the property if they didn't foreclose, so effectively they were able to just abandon the property.

So Nina was focused continually on numbers, does it make sense, does this -- you know, give me this number, give me that number. Now, how she was using those numbers, clearly I don't know. But the raw numbers either came from Gavern or myself or both.

Q Okay, so the numbers she was working

with you just said came from you or Gavern?
A I believe so.
Q Okay.
A From me she wanted to know how much debt, how much have we got to pay the city to clear all these properties. From Gavern she wanted to know how bad were they, what would it cost to get them marketable again.
Q So she was asking questions based on information third parties provided, not really providing you with numbers that she herself had --
A Oh, no.
Q Oh, no, she --
A She did not, she didn't provide any numbers to me. It was a one-way street.
Q Okay, when you say one-way, you believe you and Gavern provided her numbers --
A Yes.
Q -- "her" being Nina Huang, and that Ms. Huang asked you questions based upon the numbers you and Mr. Gavern provided?
A Right. And we were given certain

instructions over time that X property, Y property was no longer of interest.

Q Who gave you those instructions?

A Nina.

Q Nina?

A Uh-huh.

Q And did you believe that she gave those instructions based upon information that she had obtained from third parties, being you and Mr. Gavern?

A Well, I mean, logically she wanted information -- she made it clear mostly through the translator that she wanted to be the one to determine what properties get kept and what properties don't. And she asked the questions of us that would presumably give her financial information for which she could make a decision.

Q Now, did you believe at that time she was acting as a manager or just as an investor trying to protect her investment?

A I got the impression -- I mean, Cindy really did not make very many requests for

information, it was Nina.
Q Okay. And so you're saying, so initially all of your contact was with Cindy and then later became with Nina?
A Well, it became with Nina in the respect that for the most part the requests were made during meetings I attended where a number of individuals were involved. There were some instances where there were group emails that were generated by Nina, or perhaps were generated by Nina and then Cindy would translate, so I would see the Chinese and I would see the English.
Q But again, my question was, was in your mind this request, were these requests, were they from someone who was acting as a concerned investor or as somebody who was involved in management of the company? Or if you can't answer, then you can't answer.
A I really -- I really don't think I can answer what her motivation was.
Q Okay, so you never knew her to be then a manager. Was it ever represented to you by Ms.

Huang or Ms. Tao that Ms. Huang was acting as a manager?

A She was represented to me as Cindy's partner.

Q Okay.

A That was -- that was her title.

Q All right. Are you in contact with Mr. Valkenet's office about this case?

A Not often. I mean --

Q Okay.

A I haven't spoken to Tom in months.

Q What information did you provide him regarding the properties? Do you recall what information you provided Mr. Valkenet about the properties?

A I think probably the same information that you have in terms of what we redeemed and what we paid the city, financial information.

Q Is there any reason that you didn't provide this information to Ms. Huang's attorney, me?

A Never was requested.

Q Okay, Mr. Valkenet requested this information?

A Yeah, yeah. Any counsel is going to ask me for something, unless I'm directed not to by some other counsel, I do it.

Q Well, I can tell you on the record the reason I didn't request it is I never knew that the requests were being made. So --

A I'm sorry?

Q I never knew the requests were being made for updated information. Which is fine, I'll just send you an email asking for the information, simple as that.

A Okay.

Q Have you spoken to Mr. VerStandig, Mac?

A Mac?

Q Yes.

A Not in months.

Q Okay. Did you provide him this information, the redemption amounts?

A I did, four or five months ago.

MR. KIRSCH: All right. I have no

further questions.

MR. VALKENET: I have no questions.

(Off the record at 12:32 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, M. ARNOLD POLITZER, ESQUIRE, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

__________________ ________________________________

(Date) (Signature)

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Jacquelyn C. Jarboe, Registered Professional Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 29th day of July, 2018.

My Commission Expires: August 21, 2022

______________________________

NOTARY PUBLIC IN AND FOR THE

STATE OF MARYLAND

**A**

**abandon**
86:15
**ability**
75:17
**able**
25:13, 36:4, 86:15
**about**
9:9, 15:9, 17:19, 19:6, 19:12, 20:16, 20:17, 20:18, 21:21, 34:21, 36:3, 38:21, 47:1, 51:13, 54:20, 60:2, 62:13, 63:3, 67:1, 67:9, 67:11, 70:6, 70:10, 73:22, 76:17, 80:1, 82:15, 82:18, 90:8, 90:14
**above**
67:15
**absolutely**
32:18, 71:19
**accompanied**
84:19
**account**
57:14
**accounting**
41:9, 84:19
**accrue**
58:21
**accurate**
21:14, 22:10, 37:7, 40:2, 43:17, 60:7, 75:9
**acknowledge**
93:5
**acknowledgment**
93:1
**acting**
88:19, 89:15, 90:1
**active**
49:8
**actively**
32:4
**actual**
20:13, 73:10
**actually**
16:3, 16:15, 19:13, 23:16, 29:18, 35:18, 37:11, 48:11, 48:12, 56:20, 57:13, 61:5
**adapt**
16:6
**adapted**
33:16
**added**
66:18
**addition**
58:20
**additional**
23:5, 24:9, 24:12, 28:1, 54:20, 55:5, 57:2, 85:5
**address**
6:14, 25:13, 34:3, 37:16, 75:19
**addressed**
25:3
**addresses**
14:14, 14:15
**administering**
2:18
**admitted**
7:3
**affiliated**
62:20
**affirmed**
5:4
**affixed**
94:14
**after**
14:22, 15:2, 17:22, 18:2, 19:21, 25:19, 26:9, 37:14, 38:3, 43:18, 58:8, 58:13, 64:6, 67:13, 70:10, 79:2, 79:20, 86:4
**again**
12:18, 20:12, 22:7, 36:10, 45:9, 45:16, 59:17, 65:22, 76:15, 82:13, 87:8, 89:13
**against**
19:20, 20:7, 21:18, 23:16, 44:18, 60:3
**aggregate**
21:17
**ago**
83:15, 91:21
**agreed**
14:10, 27:22
**agreement**
4:15, 8:14, 9:15, 11:9, 11:11, 12:22, 15:20, 16:1, 16:2, 19:9, 25:22, 42:19, 43:5, 61:11, 69:6, 69:12, 69:13, 70:3, 81:2, 81:19
**ah**
11:19
**aids**
5:21
**al**
1:6, 3:10
**alan**
44:1, 44:4, 44:5, 55:16, 62:19, 65:4
**all**
7:8, 9:18, 12:13, 15:3, 15:6, 18:16, 20:2, 29:11, 29:19, 30:22, 33:3, 33:18, 40:22, 43:19, 44:14, 45:11, 46:14, 47:14, 53:3, 55:21, 57:22, 58:18, 58:21, 59:6, 59:9, 59:16, 60:3, 66:14, 69:18, 85:8, 87:6, 89:3, 90:7, 91:22
**allegation**
68:13, 68:14
**allow**
69:14
**allowed**
68:17
**almost**
15:18, 17:11, 64:14, 67:12, 76:1
**already**
27:12, 30:4, 37:12, 76:21, 80:12, 80:13
**also**
18:21, 20:18, 30:22, 43:14, 58:18, 78:4
**although**
13:15, 14:14, 77:6, 78:21
**always**
41:18, 50:4, 53:5
**among**
70:3
**amount**
24:13, 24:18
**amounts**
91:20
**analogous**
57:3
**another**
68:5

**answer**
81:14, 89:18, 89:20
**antagonistic**
76:13
**anticipate**
7:5, 7:7
**anticipated**
27:8, 27:9, 29:1, 66:7, 67:7
**anxious**
63:12
**any**
7:6, 16:22, 20:19, 23:7, 31:2, 38:20, 39:3, 44:17, 44:22, 45:20, 46:9, 46:16, 49:15, 49:18, 50:21, 52:22, 54:19, 56:17, 60:10, 62:11, 64:21, 67:8, 70:9, 72:2, 72:7, 74:14, 76:13, 77:13, 79:22, 80:11, 82:14, 82:18, 82:22, 83:18, 86:1, 87:14, 90:19, 91:3, 93:8, 94:11
**anybody**
85:13
**anyone**
13:20, 35:6, 70:19, 73:21
**anything**
50:17, 53:1, 53:14, 70:6
**anyway**
33:18
**anywhere**
9:2, 64:14
**apartments**
51:16
**apologize**
15:6
**apparent**
64:11, 77:21, 79:4
**apparently**
32:3, 72:15, 75:13
**appear**
64:21, 80:5, 93:8
**appeared**
23:17, 84:18
**appears**
63:22
**appointed**
55:13
**appropriate**
84:3
**approximately**
20:6, 26:7, 83:16
**april**
64:20
**are**
6:19, 8:6, 21:14, 43:2, 48:13, 52:5, 56:4, 56:7, 58:21, 62:1, 63:8, 63:14, 64:13, 67:15, 68:13, 74:15, 74:17, 78:7, 83:3, 83:4, 90:7
**arnold**
1:10, 2:1, 2:15, 4:2, 4:10, 5:3, 93:4
**around**
58:5, 60:13
**arranged**
68:22
**arrangements**
13:2
**art**
34:7
**asia**
74:19
**ask**
5:22, 11:15, 18:11, 34:21, 35:6, 39:18, 59:16, 71:16, 76:17, 77:12, 80:10, 91:3
**asked**
13:6, 35:6, 35:8, 35:10, 65:4, 83:5, 85:2, 86:2, 87:20, 88:15
**asking**
18:13, 57:16, 87:9, 91:12
**assessed**
19:20
**assessment**
60:7
**asset**
56:5, 56:17, 56:18, 82:4
**assets**
30:9, 36:5, 36:15, 38:22, 68:18
**assistance**
40:18
**assume**
49:6, 60:19
**assumption**
12:3, 12:18, 12:21, 36:5, 50:15
**attached**
4:7, 6:7, 7:15, 8:10, 28:8, 29:8, 39:14, 42:15, 43:11, 71:14, 93:9
**attend**
74:20
**attended**
46:2, 50:1, 52:9, 84:11, 89:7
**attorney**
6:18, 44:1, 90:20
**attorneys**
83:3, 83:11, 84:3
**atypical**
64:13
**auction**
45:1, 58:12
**august**
40:5, 68:6, 68:16, 70:7, 70:10, 72:20, 74:1, 94:16
**avenue**
3:13, 6:15
**aware**
20:14, 47:5, 53:10, 56:4, 56:7, 61:7, 61:10, 61:19, 68:13, 68:19, 70:20, 72:2, 75:18
**awareness**
20:14
**away**
40:15

**B**

**back**
9:19, 32:2, 52:16, 55:8, 55:22, 56:13, 57:1, 57:4, 61:5, 62:3, 64:4, 72:10
**background**
7:9, 9:20, 37:20
**backwards**
14:20
**bad**
49:17, 86:6, 87:7
**baltimore**
1:1, 1:11, 2:5, 2:8, 3:15, 4:16, 7:11, 8:21, 9:2, 9:12, 11:6,

21:1, 22:5, 33:6, 33:7, 33:8, 33:10, 33:12, 33:15, 39:21, 41:13, 41:21, 43:1, 43:6, 45:21, 52:2, 52:6, 54:4, 56:5, 56:17, 56:18, 56:21, 59:20, 61:6, 61:12, 62:5, 62:12, 62:17, 64:12, 64:13, 67:4, 69:22, 70:21, 73:21, 74:3, 75:12, 82:4, 82:8, 82:15, 82:19, 82:21, 83:2, 84:10

**baltimore-based**
65:2

**bank**
79:10

**bankrupt**
30:4

**based**
15:17, 43:10, 50:18, 52:4, 62:6, 63:21, 68:10, 87:9, 87:20, 88:8

**basically**
36:11, 37:16

**basis**
44:6, 55:3

**became**
16:7, 79:4, 89:4, 89:5

**because**
12:18, 14:18, 19:1, 21:12, 21:22, 22:19, 23:21, 26:15, 27:8, 28:1, 28:2, 29:10, 30:3, 31:15, 35:12, 37:3, 45:11, 46:12, 49:5, 51:11, 55:3, 59:7, 60:1, 66:1, 66:16, 71:1, 78:8, 81:15, 82:3, 85:17

**become**
53:10

**becomes**
22:21, 22:22, 23:1, 23:16

**been**
6:22, 10:13, 11:11, 12:8, 14:9, 14:17, 16:18, 16:19, 19:17, 23:22, 25:3, 27:11, 27:12, 35:20, 42:17, 43:11, 46:6, 46:17, 49:5, 50:15, 56:12, 57:11, 60:14, 61:11, 66:2, 72:12, 72:14, 74:13, 74:22, 77:21, 80:3, 83:5, 84:12

**before**
2:15, 5:11, 8:1, 17:22, 71:17, 77:19, 94:3

**began**
79:15

**begin**
55:3, 63:12

**beginning**
66:5

**behalf**
3:3, 3:10

**being**
5:4, 19:7, 23:1, 24:19, 26:7, 35:9, 45:12, 50:20, 54:3, 63:13, 85:18, 87:19, 88:9, 91:8, 91:10

**believe**
7:4, 8:20, 9:13, 11:14, 12:10, 14:15, 17:4, 19:16, 24:3, 25:13, 25:16, 28:14, 29:16, 30:18, 37:7, 38:12, 43:12, 43:14, 44:9, 46:8, 47:12, 48:17, 50:16, 53:1, 58:3, 67:3, 69:10, 72:19, 74:7, 75:8, 80:3, 81:1, 84:9, 87:2, 87:16, 88:7, 88:18

**believed**
15:10

**bell**
71:4

**ben**
12:9, 20:3, 37:9, 81:10

**best**
8:15, 12:22, 18:8, 21:10, 22:3, 25:11, 33:21, 37:5, 49:15

**better**
36:22, 45:3

**between**
11:5, 12:8, 24:14, 46:7, 49:19, 50:22, 52:14, 59:20, 61:11, 69:6

**beyond**
29:10, 40:19, 54:13, 62:16, 66:16

**bid**
45:4, 58:20

**big**
48:15, 57:15

**bill**
23:14, 39:17, 39:19, 40:21, 43:10

**bills**
20:9, 21:9, 21:14, 21:18, 23:3, 23:10, 23:11, 40:16, 47:11

**bird**
10:8

**bit**
5:21, 37:17, 37:20, 64:4, 84:13

**boarding**
22:1

**both**
17:21, 27:2, 28:3, 59:9, 60:4, 71:11, 74:2, 86:21

**bought**
55:22, 62:13

**brian**
77:13

**bring**
30:22, 32:20

**brought**
45:1, 53:11, 53:12

**building**
51:15

**buildings**
11:5, 29:18

**business**
6:13, 10:17, 31:22, 51:11, 51:12, 51:14, 51:19

**but**
5:5, 8:12, 9:5,

12:6, 13:17, 14:10, 20:5, 21:4, 21:18, 22:6, 22:20, 29:22, 30:21, 32:5, 32:22, 34:8, 35:17, 37:5, 41:14, 44:10, 44:19, 45:16, 47:22, 50:3, 52:2, 52:13, 54:13, 57:2, 60:17, 64:13, 66:4, 66:8, 67:13, 69:3, 69:11, 74:19, 75:13, 75:15, 77:4, 79:1, 82:11, 84:16, 85:3, 85:11, 85:14, 85:19, 85:21, 86:20, 89:13
**buy**
24:2, 36:5, 45:17
**buyer**
12:19, 60:6, 62:8, 62:9
**buyers**
59:3, 59:11
**buying**
36:14, 51:15

**C**

**c--0008**
1:6
**call**
10:1, 13:12, 23:12, 36:2, 51:15, 51:16, 76:4, 76:9
**called**
10:8, 21:6, 31:5, 56:4
**calls**
16:17, 17:1
**came**
32:2, 33:10, 43:15, 51:5, 56:14, 58:4, 64:16, 86:20, 87:1
**can**
6:5, 10:20, 15:7, 18:15, 24:18, 26:16, 28:6, 28:13, 28:20, 39:19, 40:20, 67:17, 71:21, 76:15, 76:18, 85:13, 89:19, 91:6
**can't**
26:15, 76:22, 77:4, 89:17, 89:18
**capacity**
82:22
**capital**
54:21
**capitalization**
46:10, 46:13, 46:16, 46:20, 47:1
**capitalized**
39:5
**care**
25:19
**carry**
79:1
**case**
1:5, 21:4, 29:9, 59:7, 86:12, 90:8, 94:11
**cases**
25:14, 29:17, 30:13, 31:11, 31:13
**casey**
77:13, 78:8, 80:1, 80:7
**cash**
32:10, 32:13
**cause**
29:20
**certain**
25:1, 47:15, 47:17, 55:9, 68:16, 83:7, 84:1, 85:4, 87:22
**certainly**
6:15, 14:11, 22:7, 75:6, 75:21, 76:15, 85:19
**certificate**
94:1
**certificates**
24:2, 83:4
**certify**
94:4
**certs**
37:3
**cetera**
21:9
**change**
41:6
**changed**
41:5, 77:5
**characterization**
36:6, 40:1, 40:17
**characterize**
41:16
**characters**
85:14
**charge**
77:22
**charged**
23:15, 24:18
**charges**
19:19, 21:8, 21:22, 22:15, 23:4, 23:7, 23:9, 23:18, 23:21, 24:1
**check**
29:7, 32:22
**china**
51:11, 51:22
**chinese**
12:1, 12:2, 18:9, 18:10, 18:12, 50:19, 51:11, 51:18, 85:12, 85:21, 89:12
**cindy**
8:12, 9:6, 9:7, 9:8, 9:11, 9:13, 12:4, 12:6, 13:11, 13:17, 13:20, 14:20, 16:18, 17:21, 38:11, 38:21, 39:1, 39:3, 41:5, 41:19, 42:2, 48:10, 52:9, 52:13, 52:19, 53:21, 62:18, 63:2, 63:16, 63:19, 67:9, 72:4, 78:11, 78:17, 84:15, 88:21, 89:3, 89:11
**cindy's**
52:12, 90:3
**circuit**
1:1, 24:17
**citation**
22:19, 22:20
**citations**
21:9
**city**
1:1, 11:6, 20:7, 20:9, 20:15, 21:1, 21:7, 21:8, 21:16, 21:22, 22:5, 22:9, 22:16, 22:18, 23:22, 24:2, 25:2, 25:3, 25:15, 29:6, 29:13, 32:17, 44:18, 59:15, 60:10, 78:3, 84:4, 87:5, 90:18

**claiming**
7:6
**clean**
23:12, 23:13, 79:10
**cleaning**
78:13
**clear**
20:22, 33:19, 50:19, 75:6, 79:13, 87:6, 88:12
**cleared**
47:10, 79:14
**clearly**
29:12, 86:19
**client**
8:19, 8:20, 10:6, 10:13, 10:17, 11:3, 11:8, 26:22, 27:2, 33:6, 38:1, 41:13, 41:18, 41:20, 42:3, 42:8, 42:11, 42:21, 45:2, 48:5, 79:6, 79:7
**client's**
40:22, 41:5
**clients**
41:11
**close**
17:19, 40:8, 51:20
**closed**
17:5
**closing**
26:8, 40:19
**code**
25:1, 78:3
**cody**
50:6, 50:8, 50:18, 84:20
**cody's**
50:15
**cohn**
62:20
**combination**
28:3
**come**
17:17, 36:11, 43:22, 53:4, 55:9, 63:10, 65:7, 67:11
**coming**
13:7, 13:10, 49:6
**commission**
94:16
**communicate**
16:14, 83:2
**communicated**
16:15, 67:3
**communicates**
18:12
**communication**
74:6, 74:7
**company**
25:16, 29:17, 46:10, 46:11, 46:20, 47:2, 47:5, 56:4, 56:7, 56:20, 60:15, 60:17, 60:18, 61:3, 61:9, 61:12, 62:6, 64:9, 64:21, 65:2, 65:5, 65:6, 65:8, 65:10, 65:17, 66:10, 67:1, 69:22, 70:21, 71:1, 71:3, 89:17
**compensation**
61:15
**complaint**
24:16, 24:19, 54:13, 55:16
**complete**
77:3, 93:7
**completed**
76:22
**compliant**
78:3
**concern**
63:12
**concerned**
89:15
**concerns**
46:9, 46:12, 80:4
**conclusion**
34:19, 36:11, 36:12
**conclusory**
36:2, 36:18
**condition**
22:4, 22:6, 32:20
**conditions**
31:1, 37:4
**condos**
51:16
**conducted**
58:1, 58:2
**conducts**
51:19
**conference**
16:17, 27:5
**conferences**
27:4
**confirm**
6:10, 34:22
**confused**
33:7
**connection**
12:5
**consider**
23:13, 65:1
**considered**
61:8, 82:9
**consisted**
26:3
**consistent**
27:20, 37:1, 85:19
**contact**
64:8, 84:2, 89:3, 90:7
**contacted**
10:15, 12:12, 12:15, 64:10
**contemplate**
74:4
**contemplated**
72:17
**context**
38:20
**continually**
86:16
**continue**
15:9, 17:13, 18:15, 18:22, 19:4, 28:21, 43:18, 57:22, 61:22, 83:18
**continued**
40:18
**continuing**
41:4, 62:11, 65:22
**contract**
15:12, 15:16, 17:22, 19:21, 35:3, 43:14, 58:12
**conversation**
28:5, 32:7
**conversations**
62:11, 63:14, 64:6, 67:18, 67:21, 79:12, 82:14, 82:18
**convey**
21:3, 21:4
**copied**
85:9
**copy**
38:10
**corner**
17:18, 50:2
**corporate**
29:22, 71:12
**correct**
5:16, 5:17, 7:12, 18:5, 18:14, 24:10, 24:11, 25:10, 25:11, 25:21, 26:1, 36:20,

37:9, 37:13, 38:4, 40:6, 40:9, 40:10, 41:1, 42:5, 43:16, 46:18, 48:2, 51:6, 55:13, 55:19, 57:12, 58:7, 58:9, 58:17, 59:1, 59:2, 60:12, 68:8, 68:12, 93:7, 94:6
**corrections**
93:8
**cost**
24:10, 32:19, 83:7, 84:1, 87:8
**costs**
21:18, 24:12, 28:1, 32:16, 39:20, 40:3, 58:21, 59:11, 66:19
**could**
6:13, 7:18, 20:21, 21:20, 28:19, 31:6, 33:19, 33:21, 34:8, 34:15, 36:18, 38:2, 39:11, 65:6, 78:4, 84:12, 88:17
**couldn't**
37:2, 64:17
**counsel**
5:7, 5:11, 5:20, 7:19, 62:22, 74:9, 74:11, 76:5, 81:18, 81:20, 81:22, 83:6, 91:3, 91:5, 94:10
**counties**
21:2
**couple**
15:7, 24:21, 25:12, 29:18, 85:20
**course**
44:7, 53:3, 66:9
**court**
1:1, 24:17, 58:6, 58:13, 63:6, 63:12, 72:15, 73:3, 74:21
**courthouse**
45:7, 59:1
**cover**
8:4
**covering**
44:20
**culture**
51:18
**curiosity**
62:19
**current**
29:4, 31:1
**currently**
20:7, 82:21
**cursory**
32:22

**D**

**damage**
76:13
**date**
58:22, 66:3, 67:8, 70:10, 73:10, 73:13, 93:14
**david**
53:14
**day**
10:7, 10:8, 69:10, 94:15
**days**
58:10, 58:13, 74:6, 77:18
**deal**
12:7, 12:12, 12:13, 14:9, 14:12, 15:15, 17:5, 17:20, 19:8, 20:11, 40:19, 44:6, 57:16, 61:15
**dealing**
43:19
**deals**
10:9, 10:10, 40:14
**dearth**
14:13
**debt**
22:9, 22:15, 26:5, 27:9, 31:12, 44:11, 87:5
**december**
53:17, 58:5, 60:13, 60:16, 61:22, 62:4, 62:16, 63:22, 66:8
**decision**
45:13, 45:15, 45:17, 52:7, 79:20, 88:17
**decision-maker**
51:6, 51:21, 52:3, 53:5
**decision-making**
49:12
**deed**
10:18, 11:4, 16:8, 21:20, 22:5, 44:7, 81:16
**deemed**
73:9, 73:12
**default**
44:12
**defaulted**
73:16
**defendants**
1:7, 3:10
**define**
20:21
**degree**
33:3
**delayed**
74:22
**delinquent**
24:1
**deponent**
93:1
**depos**
2:5
**deposit**
13:4, 14:2, 14:3, 57:7, 57:13
**deposition**
1:10, 2:1, 2:15, 4:8, 4:10, 5:18, 6:6, 7:6, 7:14, 8:1, 28:7, 39:13, 42:14, 71:13, 94:4
**derivatively**
82:3, 82:9
**described**
28:2
**determination**
19:14, 27:11, 48:12, 48:13, 48:15, 48:20, 48:21, 49:1, 49:4, 49:20, 51:2
**determine**
32:19, 49:8, 83:6, 84:1, 88:14
**determined**
25:2
**deutsch**
62:20
**development**
51:12
**dialogue**
85:7
**did**
6:12, 9:11, 10:1, 10:3, 10:4, 11:7, 13:17, 13:18, 13:19, 16:12,

16:14, 17:17, 20:12, 22:13, 25:16, 27:2, 30:16, 31:7, 31:14, 35:6, 35:17, 35:19, 35:22, 38:9, 38:11, 38:13, 38:20, 39:3, 43:2, 43:5, 43:8, 43:12, 43:18, 43:21, 43:22, 45:19, 47:12, 49:14, 51:11, 51:13, 52:21, 53:4, 53:10, 54:19, 55:9, 61:1, 63:3, 63:22, 64:21, 65:7, 65:20, 66:22, 67:8, 67:18, 67:21, 68:4, 70:2, 70:9, 70:11, 70:14, 77:3, 79:22, 81:12, 81:17, 81:18, 81:20, 82:13, 82:17, 82:20, 84:9, 85:7, 87:14, 88:7, 88:18, 88:22, 90:12, 91:19, 91:21
**didn't**
17:14, 22:1, 37:3, 46:12, 52:1, 52:5, 53:2, 66:9, 66:21, 67:1, 67:2, 69:7, 69:11, 70:12, 79:5, 80:2, 80:5, 86:14, 87:14, 90:19, 91:7
**difference**
30:13, 48:16
**different**
29:21, 65:1, 75:21
**diligence**
4:13, 14:11, 15:11, 15:13, 16:11, 19:22, 20:1, 22:14, 25:20, 26:3, 26:10, 27:18, 29:2, 29:3, 35:3, 35:10, 39:6
**diligently**
66:10
**direct**
5:7, 45:16
**directed**
48:4, 48:6, 48:7, 64:8, 91:4
**direction**
94:8
**disconnect**
79:19
**discuss**
39:11, 45:19
**discussing**
15:9
**discussion**
28:10, 39:9, 67:8, 80:2, 86:9
**discussions**
38:21, 39:1, 39:3, 46:22, 49:19, 50:21, 51:1, 54:19, 62:17, 62:18, 63:2, 63:3, 63:5, 63:16, 63:19, 66:22, 70:9, 73:20, 75:14, 79:3, 79:22
**dismiss**
73:1
**dismissal**
72:17, 74:4
**dismissed**
25:15
**disrepair**
29:15
**divest**
25:8
**dixon**
31:19, 33:2
**document**
4:12, 4:16, 7:22, 28:13, 32:16, 56:11, 70:18, 71:18
**documents**
35:20, 35:21, 63:21, 68:16, 69:20, 84:18
**does**
30:5, 53:13, 63:7, 71:3, 85:15, 86:17
**doesn't**
47:20
**dog**
10:8
**doing**
15:21, 16:11, 19:12, 31:4, 55:4, 60:9, 64:16, 65:21
**dollar**
20:13, 66:20
**dollars**
54:7
**dominated**
85:1
**don't**
7:7, 9:13, 11:14, 14:7, 16:3, 16:5, 22:21, 22:22, 26:16, 28:3, 28:4, 30:2, 33:11, 33:17, 34:19, 45:16, 46:21, 47:3, 50:6, 51:5, 53:15, 54:5, 54:11, 57:20, 65:5, 65:9, 66:21, 67:4, 69:6, 75:8, 76:8, 76:11, 76:12, 77:5, 85:13, 86:20, 88:15, 89:19
**done**
10:15, 13:2, 15:11, 19:21, 31:16, 34:9, 35:2, 43:4, 60:11, 64:2, 66:20, 77:8
**dongyun**
53:13
**down**
14:18
**dozen**
24:6
**draft**
19:9
**drafted**
15:17, 55:16
**drafting**
15:16, 56:10
**draw**
12:13, 45:10
**drew**
81:1, 81:2
**due**
4:13, 14:11, 15:11, 15:12, 16:11, 19:22, 20:1, 20:15, 21:7, 22:14, 22:15, 25:20, 26:3, 26:9, 27:18, 29:1, 29:2, 29:3, 35:2, 35:10, 39:5, 66:17, 75:1, 79:20
**duly**
5:4
**during**
17:16, 19:22, 20:1, 35:2, 49:22, 50:16,

53:3, 54:18, 61:21, 67:6, 74:19, 84:7, 89:7
**duties**
50:16, 79:1

**E**

**each**
19:20, 31:17, 57:7
**earlier**
37:2, 52:17, 64:7
**early**
54:19, 81:6
**earnest**
13:3
**easily**
36:19
**east**
2:6
**educate**
37:21
**education**
37:22
**effect**
63:10, 68:20
**effectively**
27:7, 73:1, 77:8, 78:19, 86:14
**effort**
64:1
**eight**
78:9
**either**
25:4, 67:19, 73:21, 75:4, 86:20
**elapsed**
23:18
**electric**
29:17
**else**
13:20, 64:14, 70:19, 78:2, 78:17
**email**
80:3, 91:12
**emails**
16:16, 85:8, 85:22, 89:9
**emphasize**
63:6
**employed**
94:10
**end**
27:18, 72:16
**ended**
35:9, 57:3
**ends**
23:1, 25:6
**engaged**
9:4, 10:5, 60:20, 64:9, 78:19, 79:2
**engagement**
8:17, 9:9, 9:11, 10:2
**english**
50:18, 89:12
**enough**
15:19, 18:20, 19:6, 19:8, 25:2, 30:21
**entered**
9:15
**entire**
66:18, 79:5
**entities**
29:22, 71:12, 80:12
**entitled**
4:16
**entity**
9:3, 25:9, 29:22, 56:17, 60:19, 62:6, 71:10, 81:15
**errata**
93:9
**error**
41:8
**escrow**
13:5, 14:3
**esquire**
1:10, 2:1, 2:15, 3:4, 3:11, 4:2, 4:11, 5:3, 93:4
**essentially**
15:12, 25:4, 31:4, 59:13, 59:19, 60:8, 73:8, 73:15, 78:6
**established**
59:19
**estate**
10:10, 31:22, 51:12, 54:4
**estimation**
37:5
**et**
1:6, 3:10, 21:9
**even**
37:8, 53:2, 85:6
**ever**
42:8, 42:11, 43:8, 46:22, 52:12, 53:4, 54:5, 71:18, 81:9, 81:12, 89:22
**every**
24:4
**everything**
37:3, 37:17, 37:18, 59:13, 59:14, 59:15
**evidence**
31:2
**exacerbate**
67:16
**examination**
4:2, 5:7
**examined**
5:6, 93:5
**example**
22:19
**exceeded**
28:22
**except**
55:5
**exceptions**
11:6
**excess**
22:16
**excuse**
8:11, 35:18, 68:14
**exhibit**
4:8, 4:9, 4:12, 4:13, 4:14, 4:15, 4:16, 6:6, 6:10, 7:14, 7:17, 11:11, 28:7, 28:13, 39:12, 39:13, 39:17, 42:14, 42:18, 43:11, 71:13
**existed**
38:17, 53:2
**expense**
55:5
**expenses**
31:8, 40:8, 54:22, 59:6
**experience**
52:4, 58:15, 62:7
**expires**
94:16
**explain**
28:17, 46:4, 74:21
**explained**
52:15
**exponential**
23:2
**extensive**
40:13
**extent**
14:9, 49:13, 49:22, 51:18, 63:9, 63:14
**extract**
31:6
**extraordinary**
52:4

**extreme**
64:1

**F**

**fact**
24:16, 27:10, 37:8, 54:11, 55:22, 56:15, 61:10, 61:19, 68:19, 72:19, 77:2, 80:7
**facts**
16:7, 52:22
**fair**
18:19, 36:5, 40:1, 40:12, 40:17, 53:8
**fairly**
25:14, 57:17, 64:13
**faith**
14:3
**fall**
66:17
**familiar**
64:15, 65:4, 65:6
**familiarity**
64:11
**far**
67:11
**fees**
4:14, 24:12, 24:15, 24:18, 40:3
**fellow**
11:21, 12:9, 84:20
**felt**
19:8, 35:12, 49:9, 49:10, 79:18
**few**
11:6, 34:21
**figure**
8:22, 68:12, 84:3
**file**
65:16
**filed**
24:16, 24:19
**files**
65:19
**fill**
27:21
**filled**
19:1
**final**
77:20
**finally**
47:9
**finance**
39:9
**finances**
67:15
**financial**
19:14, 29:4, 29:7, 49:6, 49:7, 86:10, 88:16, 90:18, 94:12
**financially**
32:16, 86:3
**financing**
47:6, 70:16
**find**
9:20, 10:9, 19:19, 21:10, 21:20, 22:1, 32:1, 51:8
**finding**
61:15
**fine**
15:3, 25:17, 38:18, 69:9, 91:11
**fink**
44:1, 44:4, 44:5, 46:3, 50:3, 55:16, 57:14, 60:18, 62:20, 63:1, 65:4, 74:2, 74:7, 74:20, 76:4
**firm**
42:9, 42:12
**firm's**
42:4
**first**
5:4, 8:3, 8:6, 8:18, 9:6, 9:16, 10:18, 11:4, 16:8, 17:8, 18:3, 18:6, 32:11, 40:21, 40:22, 44:7, 52:10, 52:12, 71:17, 81:16, 84:14, 84:15
**five**
91:21
**fix**
25:4, 25:7
**focused**
86:16
**follow**
26:20, 42:1
**following**
64:2
**follows**
5:6
**for**
1:1, 2:17, 5:7, 5:11, 6:7, 6:14, 7:10, 7:15, 8:17, 9:21, 10:10, 10:13, 10:15, 10:20, 11:16, 16:8, 19:18, 20:8, 21:8, 21:19, 21:22, 22:19, 23:13, 26:16, 27:7, 28:8, 30:12, 30:19, 31:16, 31:21, 32:18, 36:22, 39:14, 39:20, 40:3, 40:4, 40:11, 40:16, 41:16, 41:20, 42:15, 42:20, 43:6, 47:21, 50:8, 50:9, 51:10, 51:13, 51:22, 54:11, 57:7, 58:21, 59:4, 60:10, 61:15, 66:5, 66:11, 68:6, 68:10, 68:22, 71:14, 72:4, 72:20, 74:13, 75:6, 76:15, 77:4, 78:5, 78:9, 79:6, 81:7, 84:21, 85:4, 88:17, 88:22, 89:6, 91:4, 91:11, 91:12, 94:10, 94:21
**ford**
17:14
**foreclose**
44:11, 44:14, 44:22, 45:11, 45:14, 47:12, 86:14
**foreclosed**
47:16, 47:18, 48:5, 51:3, 55:2, 55:10, 69:2, 83:17, 83:20
**foreclosure**
44:16, 45:1, 45:7, 45:19, 46:5, 49:21, 55:8, 55:17, 56:8, 56:13, 56:15, 58:22, 62:14, 63:7, 66:3, 72:10, 72:18, 73:1, 73:4, 73:5, 74:5, 74:22, 75:20, 76:19, 76:22, 77:3, 78:6, 79:8, 86:11
**foreclosures**
73:8

**foregoing**
93:6, 94:4, 94:5
**forget**
56:18
**formed**
71:1
**forward**
33:22, 38:19, 69:14, 75:17, 75:19
**found**
12:1, 12:4, 21:15, 22:11, 22:15, 24:5, 24:20, 52:3
**four**
44:12, 91:21
**fourth**
41:4
**frank**
48:7, 50:5, 85:3
**fraught**
41:10
**free**
32:17, 34:2, 44:17
**friday**
1:12
**friend**
52:11
**from**
9:14, 13:7, 13:10, 15:15, 17:5, 25:5, 26:10, 29:19, 30:18, 31:7, 31:16, 32:17, 33:1, 33:11, 33:14, 34:2, 37:17, 47:10, 47:11, 48:17, 53:20, 67:4, 68:22, 73:10, 74:7, 84:4, 85:6, 86:20, 87:1, 87:4, 87:6, 88:9, 89:15
**front**
84:18
**fruition**
43:15
**full**
56:18, 66:3, 66:4
**fully**
37:2
**function**
63:8, 78:20, 78:21
**functions**
78:7
**funded**
38:22
**funding**
63:3
**funds**
69:1, 75:16
**further**
29:6, 92:1

G

**gain**
79:7
**gas**
29:17
**gather**
61:13
**gave**
14:1, 48:15, 88:3, 88:7
**gavern**
48:7, 50:5, 85:3, 86:21, 87:1, 87:6, 87:17, 87:21, 88:10
**general**
19:7
**generate**
23:3, 23:4, 75:15
**generated**
31:9, 39:20, 89:10
**generating**
55:5
**gentleman**
65:9
**gentleman's**
65:11, 65:12
**gentlemen**
30:15
**gerald**
17:14, 31:19
**get**
7:8, 10:4, 14:19, 19:2, 19:18, 21:5, 26:18, 30:21, 33:7, 36:13, 53:9, 59:5, 59:8, 59:13, 59:18, 63:12, 64:18, 66:20, 67:17, 78:4, 79:11, 84:3, 87:8, 88:14
**getting**
17:6, 17:9, 20:17, 26:4, 66:11, 74:22
**give**
7:19, 31:17, 36:7, 76:4, 76:9, 86:18, 88:16
**given**
15:16, 57:11, 74:17, 87:22, 93:8, 94:6
**giving**
39:5
**go**
10:9, 29:6, 31:17, 32:12, 35:16, 36:1, 36:17, 40:7, 40:21, 49:21, 55:8, 62:3, 69:14, 70:15, 73:18, 75:17, 79:10
**god**
44:12
**goes**
21:19
**going**
6:9, 8:16, 15:21, 16:7, 17:4, 18:22, 21:22, 27:7, 32:17, 33:20, 34:10, 35:16, 36:4, 36:12, 39:10, 39:11, 39:16, 39:18, 42:1, 42:17, 45:10, 54:22, 56:13, 59:16, 61:5, 63:15, 66:1, 67:14, 69:8, 70:16, 71:16, 72:10, 74:15, 77:12, 78:12, 80:10, 91:3
**goldberg**
62:20
**gone**
27:19, 30:4, 63:10
**good**
5:10, 14:3, 49:16
**got**
12:13, 15:14, 22:12, 33:1, 34:11, 48:17, 48:19, 51:17, 79:14, 87:5, 88:21
**gotten**
61:13
**grew**
49:7
**griffin**
32:10
**griffith**
30:1, 30:19,

32:3
**ground**
64:14
**group**
12:10, 13:12, 13:15, 30:18, 76:7, 89:9
**grow**
33:17
**guess**
22:14, 23:5, 26:4, 26:5, 73:9, 77:21, 77:22, 82:3
**guy**
30:2
**guys**
33:12

H

**h-a-i-y-i**
5:13
**h-u-a-n-g**
5:14, 16:22
**had**
8:14, 9:7, 10:6, 10:13, 10:14, 10:17, 12:8, 13:1, 14:9, 14:17, 15:7, 15:10, 15:18, 16:18, 18:4, 18:6, 19:8, 19:17, 19:18, 19:19, 20:3, 22:19, 23:6, 23:7, 23:17, 23:22, 25:2, 25:3, 27:11, 27:12, 27:13, 29:17, 30:10, 30:18, 31:2, 31:13, 31:15, 32:2, 32:6, 32:11, 34:1, 38:14, 39:4, 40:13, 41:9, 42:20, 44:19, 46:6, 46:9, 46:12, 46:15, 46:17, 47:9, 48:12, 49:5, 52:18, 54:15, 55:3, 60:21, 61:11, 61:13, 61:16, 61:17, 63:10, 64:11, 64:15, 66:2, 68:22, 69:10, 69:15, 70:22, 71:11, 72:3, 72:5, 72:7, 72:8, 73:13, 73:20, 76:21, 79:2, 79:12, 80:2, 81:1, 81:21, 82:4, 84:14, 84:17, 85:14, 86:13, 87:11, 88:8
**hadn't**
9:8
**haiyi**
5:13
**half**
24:6
**hand**
94:14
**handed**
33:1
**handle**
60:15, 64:18
**handled**
55:17
**hands**
77:6
**handwriting**
8:4, 8:7, 8:8
**handwritten**
8:4, 9:6
**happen**
66:9, 66:21, 67:1, 70:11, 70:12, 70:17
**happened**
70:14, 77:1
**happens**
21:1, 24:3, 73:17
**happy**
75:6
**harbor**
41:21
**harlem**
7:11, 8:20, 8:21, 9:2, 9:12, 33:9, 33:10, 39:21, 41:1, 41:13, 41:19, 43:1, 43:6, 45:21, 52:6, 56:21, 61:12, 62:12, 62:17, 67:4, 73:21, 74:3, 75:12, 82:4, 82:8, 82:15, 82:22, 83:2, 84:10, 85:9
**has**
11:11, 11:18, 29:5, 43:11, 54:6, 72:15, 74:22, 77:1, 77:5, 80:11
**have**
5:21, 6:22, 7:22, 8:2, 13:3, 13:15, 16:19, 17:20, 20:4, 22:19, 25:10, 32:12, 32:21, 34:18, 35:20, 36:2, 38:2, 38:9, 38:20, 39:3, 43:12, 45:11, 45:16, 46:12, 50:15, 52:22, 54:19, 56:12, 57:11, 58:9, 59:10, 59:11, 60:3, 60:14, 63:3, 64:1, 66:22, 67:8, 67:14, 67:18, 67:21, 68:17, 69:1, 70:9, 70:22, 71:1, 71:17, 71:19, 72:12, 72:14, 72:16, 73:20, 74:2, 74:12, 74:14, 75:6, 76:8, 76:21, 77:6, 77:20, 77:22, 78:17, 79:22, 80:3, 81:9, 81:17, 81:18, 81:20, 81:22, 82:14, 83:1, 83:5, 83:9, 83:18, 84:12, 85:7, 86:1, 87:5, 90:17, 91:15, 91:22, 92:2, 93:5, 94:11, 94:13
**haven't**
21:15, 90:11
**having**
46:22, 62:10, 80:21
**he'd**
30:4, 31:21
**he's**
62:22
**heard**
75:14, 75:20, 75:22, 76:1
**hearing**
5:21, 72:19, 74:1, 74:4, 74:19, 74:20
**heat**
31:14
**heck**
15:20
**held**
2:2, 13:4, 14:3, 28:10, 51:20, 57:14

**helpful**
19:5, 76:14
**her**
9:16, 17:17, 38:16, 39:5, 41:20, 42:7, 50:18, 54:22, 55:1, 63:3, 63:6, 67:10, 69:6, 72:4, 74:8, 83:6, 83:11, 84:15, 84:16, 84:18, 84:21, 85:20, 85:22, 87:17, 87:19, 88:16, 88:20, 89:20, 89:21, 90:6
**here**
5:15, 19:10, 21:4, 21:6, 46:19, 54:8, 61:2, 70:14, 71:22, 72:11
**here's**
34:6, 34:8
**hereby**
93:5, 94:4
**hereunto**
94:13
**herself**
14:21, 87:11
**higher**
68:12
**him**
10:15, 11:9, 31:16, 32:7, 32:8, 50:12, 76:8, 76:16, 78:10, 78:14, 79:17, 79:21, 90:12, 91:19
**himself**
62:21
**his**
10:8, 11:3, 11:8, 11:21, 31:19, 38:9, 50:6, 54:9, 55:17, 65:9, 77:16, 78:8, 79:6
**holder**
57:3, 59:21, 60:5, 86:13
**holding**
64:7, 83:3
**homes**
19:18, 19:20
**honest**
13:16, 30:2, 33:3, 85:12
**honestly**
16:19, 46:21, 53:7, 53:15, 61:4, 65:8, 80:4
**honesty**
29:11
**hormong**
30:7, 30:10
**hormung**
30:5, 30:10, 30:19, 32:5
**house**
22:1
**houses**
29:11
**how**
6:22, 10:4, 12:5, 21:7, 31:14, 38:21, 39:4, 41:12, 48:20, 49:3, 50:22, 51:5, 51:18, 51:22, 55:6, 71:1, 73:22, 74:15, 85:13, 85:15, 86:19, 87:4, 87:5, 87:7
**huang**
5:13, 16:20, 16:22, 38:13, 49:20, 50:22, 51:1, 51:6, 52:18, 52:20, 67:22, 68:14, 68:15, 72:3, 86:2, 87:19, 87:20, 90:1
**huang's**
74:11, 90:20
**husband**
42:7

**I**

**i'll**
28:17, 53:21, 75:5, 76:8, 85:12, 91:11
**i've**
28:12, 75:14, 75:21, 76:1
**ian**
3:11
**idea**
20:4, 38:9, 46:13, 64:15, 72:7, 74:12, 78:17, 81:22
**identification**
6:7, 7:15, 28:8, 39:14, 42:15, 71:14
**identified**
9:3, 13:14, 14:1, 14:21, 16:18, 55:21
**identify**
11:7, 13:17, 13:19, 28:13, 28:20, 39:19
**identity**
59:8, 59:19
**immediately**
77:19
**impact**
75:16, 75:19
**imperative**
66:14
**important**
79:18
**imprecise**
22:3
**impress**
67:10
**impression**
79:13, 88:21
**include**
86:11
**included**
34:14, 34:18
**including**
76:5
**increase**
68:9
**incurred**
40:3, 40:4
**independent**
81:18
**individual**
31:15, 31:18, 41:12, 41:14, 41:15
**individually**
41:19
**individuals**
32:11, 61:13, 89:8
**information**
13:1, 14:13, 16:10, 16:13, 19:8, 21:16, 38:2, 46:16, 49:14, 51:19, 53:6, 83:10, 84:5, 85:5, 87:10, 88:8, 88:12, 88:17, 89:1, 90:12, 90:14, 90:16, 90:18, 90:20, 91:2, 91:11, 91:12, 91:20
**initial**
13:4, 38:21, 77:18
**initially**
11:8, 18:19, 18:21, 27:6, 27:15, 29:1, 34:12, 52:8,

52:19, 89:3
**insofar**
17:6
**instances**
83:4, 89:9
**instructed**
83:22
**instruction**
48:17, 48:19, 74:14, 74:17
**instructions**
14:2, 15:17, 48:15, 88:1, 88:3, 88:8
**interacted**
32:7
**interacting**
41:14
**interest**
23:5, 59:8, 72:4, 88:2, 94:12
**interested**
10:18, 11:3, 54:4
**interests**
9:12
**interrupt**
10:20
**into**
9:15, 16:2, 18:18, 24:1, 31:3, 47:5, 54:10, 66:1
**introduced**
12:7, 50:12, 52:11, 53:22, 54:2, 54:3
**invested**
54:6, 54:9
**investment**
1:3, 3:3, 5:8, 5:12, 7:11, 8:21, 9:2, 33:9, 33:20, 39:21, 43:2, 43:6, 45:21, 52:21, 82:22, 88:20
**investor**
88:19, 89:16
**investors**
53:11, 53:12
**invited**
17:17
**involved**
10:4, 10:16, 20:12, 26:21, 27:1, 30:3, 32:4, 32:6, 32:21, 39:1, 46:6, 49:11, 49:13, 49:18, 50:21, 56:10, 61:20, 69:19, 75:13, 78:5, 89:8, 89:16
**involvement**
40:13, 43:13, 54:15, 60:21, 61:16, 61:17, 77:16, 83:21
**irrespective**
60:1
**isn't**
63:13
**issues**
26:6, 29:13, 29:14, 29:15, 29:16, 29:19, 75:19, 79:3
**it's**
8:12, 15:8, 20:22, 21:21, 22:3, 23:12, 23:13, 23:15, 31:5, 34:7, 34:17, 36:4, 36:12, 36:22, 37:15, 37:17, 38:19, 40:14, 40:17, 51:10, 53:19, 58:18, 63:15, 65:13, 66:12, 67:11, 74:13
**items**
14:12, 35:19
**its**
22:2, 22:7, 72:16, 81:17, 94:12
**itself**
16:6, 77:5

**J**

**jack**
65:13, 65:14, 65:17
**jacquelyn**
1:22, 2:16, 94:2
**jarboe**
1:22, 2:16, 94:2
**job**
1:20, 18:18, 84:20
**joint**
16:16
**journey**
67:13
**jude**
81:13, 81:15, 81:17, 81:18, 82:2, 82:5, 82:7
**judge**
77:7
**july**
1:12, 40:21, 41:6, 46:8, 46:20, 66:4, 66:6, 94:15
**june**
64:2, 64:3, 66:13, 66:15, 66:16, 66:21, 67:7, 68:5
**jurisdictions**
6:19
**just**
6:10, 8:22, 9:20, 15:6, 22:1, 23:3, 24:9, 26:16, 27:19, 27:21, 28:2, 28:14, 29:1, 30:1, 34:19, 34:22, 35:12, 35:14, 38:19, 39:10, 39:17, 47:15, 52:16, 57:16, 62:19, 64:4, 64:15, 64:17, 67:16, 69:9, 71:16, 71:21, 76:3, 77:5, 77:10, 80:3, 80:5, 80:10, 82:13, 85:8, 86:15, 87:1, 88:19, 91:12

**K**

**keep**
71:21, 73:3, 86:12
**keeping**
49:9, 49:10
**kept**
88:14
**kind**
32:16
**kirsch**
3:4, 3:5, 4:3, 5:9, 5:11, 5:19, 6:2, 6:5, 28:6, 28:11, 91:22
**knew**
15:19, 19:6, 31:15, 52:9, 78:10, 89:21, 91:7, 91:10
**know**
8:18, 9:1, 13:13, 14:11, 15:17, 26:16, 28:3, 28:4, 31:14, 33:11, 37:4, 41:6, 42:6, 46:19, 48:19, 49:3, 50:8, 51:5,

51:20, 52:5, 53:1, 53:2, 53:15, 54:8, 54:11, 57:18, 57:20, 63:1, 63:10, 65:8, 65:9, 65:20, 66:21, 67:2, 67:4, 67:11, 67:12, 67:13, 69:7, 70:6, 72:9, 74:10, 75:9, 76:18, 77:2, 77:5, 77:12, 77:13, 77:16, 78:2, 78:11, 83:13, 85:13, 85:15, 86:18, 86:20, 87:4, 87:7
**knowing**
34:10, 52:2
**knowledge**
8:15, 18:8, 25:11, 38:15, 44:20, 45:16, 48:14, 49:15, 81:20
**known**
7:10, 16:7, 78:8

**L**

**lack**
10:10, 36:22
**lady**
13:11
**land**
81:2, 81:3
**large**
31:12
**largely**
63:5, 66:13
**larry**
3:4, 3:5, 5:10
**last**
18:17, 36:18, 40:7, 50:6, 65:14, 74:6, 83:13
**late**
17:5, 46:8, 47:4, 53:9, 53:16, 54:18, 72:3, 81:5, 84:13
**later**
17:2, 17:3, 36:17, 47:4, 66:15, 84:13, 89:4
**latter**
46:3
**law**
3:5, 24:17
**lead**
12:11, 19:18, 53:1
**leading**
67:7
**learn**
16:12, 51:17
**learned**
16:10, 16:13, 51:10
**least**
18:19, 27:14, 32:22, 34:8, 44:12, 51:21, 64:16, 75:4, 78:3
**legal**
4:14, 8:17, 10:15, 19:15, 24:12, 24:15, 24:18, 26:6, 39:17, 39:19, 43:10, 80:11, 81:7, 81:9, 81:12, 81:20, 82:1, 82:22, 84:8
**legitimately**
34:5
**lender**
56:1, 57:1, 59:10, 68:22, 69:16, 69:18, 73:18
**leonce**
10:7, 10:12, 10:13, 11:18, 11:19, 12:4, 12:10, 12:16, 12:21, 13:6, 15:4, 15:15, 16:15, 16:17, 20:4, 20:6, 35:12, 38:5, 61:7, 62:1, 78:10, 78:16, 79:16
**less**
47:22, 48:2
**lesser**
63:9
**let**
7:8, 14:18, 18:22, 26:20, 34:21, 64:4, 76:17
**let's**
9:19, 11:14, 24:17, 30:16, 40:21, 53:9, 55:8, 55:12, 57:22, 61:22, 62:3, 84:22, 85:8
**letter**
37:15
**liability**
61:9, 70:21
**licensed**
6:19, 6:22
**lien**
20:17, 20:21, 21:6, 21:12, 21:13, 22:4, 22:12, 23:12, 23:16, 29:5, 37:3, 83:3, 84:4
**liens**
20:7, 20:8, 29:13, 32:18, 34:2, 44:18, 59:9, 60:3, 60:10, 60:11
**like**
23:9, 37:21, 71:7
**likely**
44:21, 74:8, 77:11
**limited**
61:9, 62:18, 70:21
**line**
27:5
**link**
12:3
**list**
47:15, 48:4
**listen**
64:7
**literally**
32:11, 81:16
**litigation**
20:20, 75:1, 75:4, 83:5
**little**
12:19, 31:2, 37:17, 37:20, 38:19, 38:20, 64:4, 86:7
**llc**
1:3, 3:3, 5:8, 5:12, 39:22, 43:2, 43:6, 56:5, 80:14, 80:16, 81:13, 81:15, 81:17, 82:7, 82:16, 84:10
**loan**
35:20, 68:16, 68:17, 68:22, 69:4, 69:8, 69:14, 69:20, 70:4, 70:7, 70:11, 70:18
**loans**
44:18

**local**
63:9
**located**
69:15
**logically**
88:11
**long**
3:6, 86:9
**longer**
14:16, 25:6, 32:6, 61:8, 61:20, 88:2
**look**
7:18, 30:8, 37:22, 40:15, 40:20, 71:16
**looking**
11:16, 33:22, 41:3, 41:16, 43:3, 71:22, 80:6
**lose**
45:10
**lost**
14:17, 25:10, 27:12, 28:2
**lot**
14:11, 16:12, 18:22, 19:1, 51:14, 79:1
**low**
6:3
**lunch**
17:20, 52:10

**M**

**mac**
74:9, 91:15, 91:16
**made**
12:3, 12:5, 12:18, 12:20, 13:3, 14:2, 14:9, 27:11, 41:7, 45:13, 45:15, 48:12, 48:14, 48:20, 48:22, 49:1, 49:3, 64:1, 68:17, 70:19, 73:2, 79:20, 83:14, 85:4, 86:7, 86:10, 86:12, 88:12, 89:6, 91:8, 91:11
**majority**
85:2
**make**
19:13, 49:15, 51:2, 85:17, 86:17, 88:17, 88:22
**maker**
52:7
**makes**
30:13
**making**
57:15, 64:21
**maldanado**
12:9, 17:6, 20:3, 37:9, 81:10, 81:21
**mall**
32:1
**man**
50:5
**managed**
34:4
**management**
25:16, 89:17
**manager**
50:5, 85:4, 88:19, 89:22, 90:2
**managers**
84:10
**manner**
34:10, 54:2, 78:20
**many**
6:22, 23:7, 31:11, 58:16, 85:7, 85:8, 85:11, 88:22
**mao**
53:13, 54:9, 67:19, 68:15, 76:6
**march**
10:16, 10:22, 17:5, 40:4, 46:7, 64:19
**mark**
5:19, 6:5, 28:6, 39:11
**marked**
6:7, 6:9, 7:15, 7:17, 11:11, 28:8, 28:12, 39:14, 39:16, 42:15, 42:17, 71:14
**market**
31:1, 32:20
**marketable**
87:8
**mary**
53:14
**maryland**
1:11, 2:8, 2:18, 3:7, 3:15, 6:16, 6:21, 7:1, 63:8, 94:22
**matter**
5:12, 21:13, 47:20
**matthew**
30:5, 30:7
**may**
5:22, 13:15, 16:19, 17:7, 21:17, 24:3, 43:15, 43:17, 50:15, 56:12, 75:4, 77:21, 80:3
**maybe**
9:19, 34:19, 76:5, 81:5
**mean**
13:7, 20:21, 23:9, 23:11, 34:17, 52:8, 53:14, 86:4, 88:11, 88:21, 90:9
**meandered**
18:16
**meaning**
17:4, 45:6, 62:15, 77:19
**means**
19:17, 23:21, 24:22
**meet**
17:19
**meeting**
46:2, 46:4, 84:11, 84:17, 85:1
**meetings**
50:1, 50:2, 50:16, 89:7
**members**
45:20, 46:15, 56:21, 61:8, 62:11
**membership**
70:20
**memo**
60:2
**memory**
68:21, 71:20
**mention**
69:7, 70:19
**mentioned**
15:3
**mess**
78:13
**met**
5:11, 9:7, 9:8, 9:13, 9:16, 17:16, 17:21, 18:4, 52:10, 52:12, 53:19, 53:20, 78:14, 84:14, 84:15, 84:16
**mid**
72:3
**might**
47:19, 57:2,

76:14
**million**
36:13, 37:5, 37:6, 37:12
**mind**
76:8, 89:14
**mine**
10:13
**minimize**
31:10
**minimum**
9:14, 36:13, 36:16, 36:17, 37:5, 37:6
**minute**
36:7
**modern**
10:11
**moment**
7:19
**money**
13:3, 13:6, 14:22, 21:7, 30:21, 31:3, 31:6, 34:1, 34:2, 36:3, 45:3, 57:10, 57:13, 57:18, 73:7, 73:17
**moneys**
20:15
**month**
32:12
**months**
9:14, 83:15, 86:9, 90:11, 91:18, 91:21
**more**
9:14, 10:11, 16:7, 24:6, 27:6, 27:7, 27:8, 32:21, 36:19, 37:11, 41:15, 44:13, 49:7, 54:5, 58:16, 79:9
**morning**
5:10
**mortgage**
44:20
**most**
18:11, 74:5, 77:11, 89:6
**mostly**
33:2, 35:20, 88:12
**motivation**
89:20
**moving**
14:20, 36:22, 37:6, 38:19, 64:22, 75:19
**mrs**
69:2, 84:5
**much**
21:7, 29:6, 32:21, 36:21, 38:2, 54:4, 87:4, 87:5
**municipal**
19:19, 23:7, 23:9, 23:14, 23:21
**must**
21:5
**myself**
16:12, 50:3, 50:4, 60:18, 74:2, 76:15, 85:3, 86:21

**N**

**name**
9:6, 10:6, 11:18, 11:22, 12:6, 12:9, 13:11, 13:15, 30:5, 31:19, 33:8, 40:22, 41:5, 41:11, 50:6, 50:7, 53:13, 56:18, 65:9, 65:11, 65:12, 65:14, 71:3
**name's**
5:10
**named**
81:21
**names**
41:12, 70:22
**narrative**
19:5
**nature**
35:13, 51:17
**ndc**
56:5, 56:17, 56:18, 59:20, 61:6, 62:5, 62:12, 69:22, 70:21, 71:10, 73:21, 82:19
**nearing**
75:5
**nearly**
72:4
**necessarily**
44:10
**need**
9:19, 54:20, 67:12, 68:10, 78:12
**needed**
13:3, 33:3, 40:18, 55:2, 63:4, 69:9, 72:9
**needs**
76:5
**negotiated**
20:11
**negotiating**
26:21
**negotiation**
12:11, 51:14
**negotiations**
20:13, 27:1
**neither**
94:10
**never**
20:12, 30:3, 32:6, 32:7, 41:19, 42:3, 43:9, 46:13, 51:20, 52:1, 52:15, 53:6, 72:7, 73:13, 74:13, 79:14, 89:21, 90:22, 91:7, 91:10
**new**
33:14, 53:10, 68:11
**next**
39:12, 77:7, 78:9
**nina**
5:13, 16:20, 16:22, 17:16, 17:21, 18:4, 18:7, 18:12, 38:13, 38:17, 48:12, 48:18, 48:22, 49:3, 50:4, 50:17, 52:11, 52:18, 54:2, 70:18, 84:14, 84:17, 84:22, 85:7, 85:9, 85:12, 85:18, 86:16, 87:19, 88:4, 88:5, 89:1, 89:4, 89:5, 89:10, 89:11
**nobody**
35:8
**non-collection**
29:15
**none**
46:15, 56:15, 56:16, 70:8
**nonpayment**
29:13
**nonprofit**
30:18
**nor**
60:18, 94:10
**normal**
62:7
**normally**
59:3
**not**
6:2, 8:6, 8:8,

9:3, 9:17, 10:3, 10:8, 11:7, 11:18, 12:7, 13:15, 15:5, 20:12, 21:4, 21:14, 21:21, 22:17, 23:7, 23:22, 25:3, 27:1, 28:4, 30:7, 30:21, 34:7, 35:16, 37:15, 40:14, 45:12, 49:10, 49:15, 52:2, 52:3, 52:8, 52:21, 54:4, 57:15, 60:17, 61:1, 61:4, 63:22, 64:21, 66:6, 68:4, 69:3, 70:11, 72:12, 72:14, 73:3, 74:15, 74:18, 75:15, 75:16, 75:21, 76:12, 77:1, 77:5, 78:22, 79:16, 82:17, 82:20, 83:17, 83:19, 85:2, 85:7, 85:8, 85:11, 85:19, 87:10, 87:14, 88:22, 90:9, 91:4, 91:18, 94:9
**notarial**
94:14
**notary**
2:17, 94:1, 94:21
**note**
12:9, 12:20, 25:9, 44:8, 45:12, 45:18, 57:3, 59:21, 60:5, 77:20, 86:13
**noted**
23:19
**nothing**
5:5, 52:18, 55:5, 75:9, 75:10, 75:17, 76:1, 78:2, 80:21
**notice**
2:14, 4:9, 5:18, 72:17, 74:3, 74:10
**noticed**
84:17
**now**
13:13, 19:21, 25:18, 34:6, 34:12, 36:1, 37:14, 43:1, 43:10, 43:13, 46:6, 46:7, 46:19, 47:14, 54:8, 61:5, 61:22, 62:3, 68:9, 69:12, 76:17, 83:1, 84:7, 86:19, 88:18
**null**
73:12
**nullity**
73:5, 73:6
**number**
16:16, 19:14, 21:2, 22:17, 23:20, 24:5, 24:20, 27:4, 30:8, 30:19, 47:19, 52:1, 53:20, 55:12, 74:18, 79:3, 79:12, 83:5, 84:17, 86:18, 89:7
**numbers**
37:8, 71:22, 84:19, 86:17, 86:19, 86:20, 86:22, 87:11, 87:15, 87:17, 87:20
**nunc**
73:9
**nutshell**
51:19

**O**

**oath**
2:18
**obligations**
29:8
**obtained**
88:9
**occasionally**
11:19
**occupation**
10:9
**occur**
63:22, 68:4, 72:22
**occurred**
27:13, 49:19, 73:14
**off**
11:8, 18:18, 28:10, 29:18, 38:4, 92:3
**office**
8:14, 17:18, 50:1, 55:17, 78:8, 78:9, 80:11, 84:12, 90:8
**officer**
94:3
**officers**
45:20
**offices**
2:2, 3:5, 39:20
**officiated**
2:18
**often**
90:9
**oftentimes**
58:15
**oh**
9:8, 71:5, 72:1, 87:12, 87:13
**okay**
6:4, 6:5, 6:13, 7:5, 7:8, 7:21, 7:22, 8:10, 8:16, 8:22, 9:5, 10:4, 11:2, 11:19, 12:17, 13:19, 13:22, 14:6, 15:6, 15:8, 16:4, 18:3, 18:6, 18:9, 18:15, 18:16, 19:6, 19:11, 26:2, 27:17, 27:20, 28:18, 31:20, 34:16, 34:21, 35:16, 36:1, 36:10, 37:8, 37:14, 38:18, 39:8, 39:10, 40:7, 40:11, 43:10, 47:19, 50:14, 51:8, 53:8, 53:9, 54:12, 55:8, 56:13, 57:10, 57:18, 58:4, 60:13, 61:5, 61:18, 62:3, 62:10, 62:19, 63:1, 63:21, 65:16, 68:4, 68:9, 69:17, 71:21, 72:1, 72:9, 72:22, 73:20, 75:2, 77:12, 78:18, 80:7, 80:10, 82:11, 83:13, 83:16, 85:10, 86:22, 87:3, 87:16, 89:2, 89:21, 90:5, 90:10, 91:1, 91:14, 91:19

**once**
13:2, 19:6, 77:6, 82:6, 84:11
**one**
5:20, 10:14, 12:10, 16:19, 19:14, 21:5, 21:10, 21:17, 21:19, 21:20, 27:3, 29:16, 30:1, 31:22, 40:14, 49:17, 52:1, 54:1, 62:9, 69:3, 74:8, 74:18, 75:4, 76:12, 77:2, 83:6, 85:2, 88:13
**one's**
49:16, 49:17
**one-way**
87:15, 87:16
**ongoing**
43:12, 86:8
**only**
8:12, 25:12, 30:21, 52:8, 54:1, 63:1, 69:3, 72:6, 75:11, 76:15, 80:2, 82:4, 83:1, 83:21, 85:3
**open**
73:4
**operated**
51:13
**operating**
43:5
**opinion**
37:15, 45:2
**opportunity**
52:22
**order**
21:2, 21:3, 21:4, 59:8, 77:7, 77:8
**original**
47:22
**ostensibly**
30:20
**ot**
1:6
**other**
30:2, 39:5, 41:20, 52:14, 54:3, 82:11, 91:5
**others**
16:19, 69:6
**otherwise**
74:18, 94:12
**our**
41:8, 74:20, 75:3
**out**
9:1, 9:20, 10:9, 12:1, 14:15, 19:19, 21:10, 21:20, 32:1, 38:20, 51:9, 53:6, 60:11, 62:19, 70:4, 79:1, 80:4
**outcome**
94:12
**outstanding**
21:14, 26:6
**over**
18:16, 22:16, 37:12, 67:15, 79:3, 86:9, 88:1
**oversight**
22:14, 83:18
**owed**
21:11, 24:3, 27:6, 31:12, 59:14, 59:15
**own**
25:6, 45:4
**owned**
29:21, 30:15, 56:21, 81:1, 81:16
**owner**
12:8, 25:4
**owners**
29:22, 44:11, 45:3
**ownership**
59:20, 60:19, 61:6, 61:14, 79:7, 82:5
**owns**
65:9

**P**

**package**
14:16, 19:16, 26:5, 29:9, 29:11, 29:12, 29:20, 66:11
**page**
4:2, 4:8, 8:11, 8:12, 11:17, 26:17, 27:3, 34:17, 35:16, 35:18, 36:1, 40:7, 40:20, 40:22, 41:3, 41:4, 80:5
**pages**
1:21, 8:3, 8:6
**paid**
17:6, 23:7, 23:22, 31:10, 32:9, 37:11, 44:19, 45:12, 59:10, 66:2, 66:4, 66:6, 66:7, 90:18
**paper**
21:5, 21:6, 35:15
**paperwork**
12:14, 12:16
**paragraph**
36:18
**parameters**
15:14
**parcel**
45:17
**park**
7:11, 8:20, 8:21, 9:2, 9:12, 33:9, 33:10, 39:21, 41:1, 41:14, 41:19, 41:22, 43:6, 45:21, 61:12, 62:17, 67:5, 73:22, 74:3, 75:13, 82:4, 82:8, 82:22, 83:2, 85:9
**part**
9:10, 14:16, 25:17, 28:14, 28:15, 28:16, 34:12, 41:8, 44:7, 45:17, 46:3, 51:14, 75:4, 75:17, 76:14, 89:6
**particular**
11:21
**parties**
58:9, 59:12, 60:2, 87:10, 88:9, 94:11
**partner**
11:21, 52:11, 52:15, 90:4
**partnered**
11:20
**partners**
54:1, 71:11
**party**
32:3, 45:8, 60:9
**passed**
70:10
**patience**
72:16
**pay**
21:19, 22:21, 22:22, 32:13, 59:11, 59:12, 60:3, 60:5, 60:6, 67:14, 68:10, 87:5
**paying**
27:7, 36:15,

58:20, 59:13
**payment**
41:16
**penalty**
23:4
**people**
11:20, 27:4, 30:1, 38:4, 51:18, 53:20, 54:3, 77:13
**percentage**
61:14
**performed**
41:20
**perhaps**
9:14, 10:16, 24:5, 24:6, 44:13, 64:19, 65:7, 74:9, 76:8, 84:13, 89:10
**period**
19:22, 20:1, 26:3, 26:10, 35:3, 40:4, 40:12, 40:16, 46:7, 53:9, 54:18, 58:9, 60:16, 61:21, 62:1, 64:1, 81:4, 84:9
**permission**
36:7
**person**
51:2, 52:9, 54:1
**personally**
30:3, 42:3, 42:8, 42:11
**persuaded**
73:3
**physical**
34:3
**physically**
32:6, 78:1, 86:7
**picked**
62:6
**picture**
33:5, 33:19, 49:7
**pictures**
34:15, 34:20
**piece**
21:5, 35:14, 37:22, 80:22
**pieces**
19:1, 27:21
**pinehills**
72:5, 80:16
**pires**
4:12
**place**
16:2, 18:17, 26:4, 26:6, 26:7, 69:9, 69:13, 70:3, 70:16
**places**
23:22
**plaintiff**
1:4, 3:3, 5:8
**plaintiff's**
19:10
**plaintiffs**
5:12, 75:15
**plan**
44:8, 44:9, 44:10, 44:14, 44:22, 49:7
**planet**
2:5
**please**
17:13, 28:21, 76:10
**poetic**
13:9
**point**
7:5, 7:7, 7:9, 13:6, 13:14, 13:19, 14:8, 15:19, 17:2, 17:3, 17:21, 19:9, 19:17, 33:6, 38:1, 38:14, 43:18, 44:16, 45:11, 46:6, 46:11, 46:17, 47:10, 47:11, 58:8, 61:7, 61:11, 61:20, 62:10, 62:15, 64:19, 66:14, 72:2, 73:7, 79:5, 80:4, 80:8, 83:22, 85:6, 85:17, 85:21, 86:5
**politzer**
1:10, 2:1, 2:15, 4:2, 4:8, 4:10, 5:3, 6:6, 7:14, 28:7, 39:13, 42:14, 71:13, 93:4
**portfolio**
48:1
**portion**
75:12
**portions**
8:4
**position**
73:22
**possible**
53:19, 66:15, 76:20
**possibly**
24:13, 84:12
**post**
59:12, 60:6
**post-foreclosure**
59:10, 60:4
**posture**
74:21
**potential**
29:7, 33:22
**power**
29:18
**practical**
21:13, 66:20
**pratt**
2:6
**pre**
59:9, 60:5
**pre-foreclosure**
60:4
**pre-receivership**
24:22
**premier**
80:13
**prepare**
35:7, 35:8, 43:2, 43:5
**prepared**
42:20
**preparing**
78:5
**presale**
59:11
**present**
33:5, 33:18, 33:21, 52:21
**presented**
43:9
**presenting**
52:19
**presumably**
88:16
**presuming**
34:1, 34:2
**pretty**
36:21, 78:16, 78:17
**previously**
42:18
**price**
14:10, 26:10, 26:13, 26:21, 26:22, 27:22, 45:2, 58:20
**principals**
45:20, 69:19, 69:21, 69:22, 70:3
**prior**
9:9, 10:14, 14:22, 24:19
**privilege**
7:6
**privy**
28:4, 46:14
**pro**
73:9

**probably**
10:14, 17:6, 28:22, 77:19, 81:5, 90:16
**problem**
5:21, 6:2, 65:22, 67:16
**problems**
34:3, 41:10, 43:19
**procedural**
77:10
**procedure**
62:7
**proceed**
69:8, 74:15, 74:16
**proceeds**
63:4
**process**
45:19, 46:5, 47:4, 49:5, 74:21, 76:19, 77:4, 77:19
**produced**
38:3
**profession**
6:17
**professional**
2:16, 34:10, 94:3
**progress**
64:21
**prohibits**
24:17
**project**
7:10, 7:11, 34:9, 36:13, 39:4, 39:22, 40:13, 43:13, 43:15, 52:6, 52:19, 77:17, 79:6
**pronunciation**
30:12
**properly**
34:5
**properties**
11:7, 14:14, 15:10, 16:9, 19:15, 19:16, 20:19, 23:6, 23:20, 23:22, 25:1, 26:5, 27:12, 27:16, 28:2, 29:12, 29:21, 30:16, 30:17, 30:20, 31:3, 31:6, 31:8, 31:9, 31:12, 32:4, 32:12, 32:20, 32:22, 34:1, 35:13, 37:4, 43:20, 44:11, 44:15, 44:17, 44:21, 45:1, 47:6, 47:10, 47:13, 47:15, 47:16, 47:17, 48:5, 49:9, 49:10, 49:21, 51:3, 55:1, 55:9, 55:12, 55:21, 56:8, 56:15, 56:16, 57:4, 57:8, 58:13, 60:14, 62:5, 62:13, 63:4, 63:11, 64:12, 66:1, 66:11, 67:15, 69:2, 72:12, 72:14, 75:20, 76:18, 76:21, 78:1, 78:5, 80:16, 83:8, 83:17, 83:19, 84:2, 86:5, 86:6, 86:10, 87:6, 88:14, 88:15, 90:13, 90:15
**property**
20:8, 21:3, 21:5, 21:9, 21:11, 21:18, 23:4, 23:16, 25:9, 29:5, 29:8, 29:14, 31:17, 32:17, 34:4, 45:4, 45:6, 50:4, 57:10, 58:11, 58:19, 59:5, 59:8, 60:3, 64:17, 66:7, 66:17, 67:14, 77:3, 78:22, 79:4, 79:7, 80:22, 81:3, 85:4, 86:14, 86:15, 88:1
**property-by-property**
55:3
**protect**
88:20
**provide**
7:10, 81:12, 84:4, 87:14, 90:12, 90:20, 91:19
**provided**
46:15, 49:14, 57:7, 69:1, 72:16, 80:11, 81:9, 82:1, 83:10, 85:5, 87:10, 87:17, 87:21, 90:14
**providing**
40:18, 84:8, 87:11
**provision**
36:3
**public**
2:17, 55:19, 56:14, 94:1, 94:21
**pumped**
34:1, 34:3
**purchase**
4:15, 14:10, 25:20, 30:17, 30:21, 38:22, 42:18, 44:15, 47:6, 56:8, 58:10, 63:4, 68:17, 68:20, 69:2, 69:19, 81:19
**purchased**
19:7, 30:16, 30:17, 31:1, 44:17, 56:16, 58:14, 72:12, 72:14, 76:19, 82:7
**purchaser**
12:2, 58:19, 59:20, 73:16
**purchasers**
58:16, 62:5
**purchases**
73:1
**purchasing**
10:18, 11:3, 25:9, 44:7, 60:19
**purpose**
21:19, 32:14, 44:3, 44:5, 46:4
**pursuant**
2:14, 5:15
**put**
15:19, 16:2, 31:2, 72:3, 72:6, 72:8, 74:2

**Q**

**question**
8:18, 18:17, 26:20, 36:10, 71:17, 89:13
**questioned**
52:1
**questions**
7:9, 15:7, 39:18, 85:2, 85:22, 86:2, 87:9, 87:20, 88:15, 92:1,

92:2
**quickly**
25:14
**quite**
79:5
**quo**
55:4

**R**

**raise**
6:3, 54:20
**raping**
31:5
**ratification**
58:8, 58:13
**ratified**
58:6, 60:14
**raw**
86:20
**reached**
61:11, 72:15
**read**
36:8, 54:13, 85:13, 93:5
**readapt**
16:6
**reading**
94:8
**ready**
66:11, 66:13, 70:15
**real**
10:10, 31:22, 51:12, 51:21, 52:2, 54:4
**reality**
21:19, 41:18
**really**
9:20, 12:7, 14:16, 14:18, 26:15, 36:3, 36:4, 37:2, 37:15, 41:11, 53:21, 67:12, 75:16, 87:10, 88:22, 89:19
**realty**
80:13
**rear**
22:20
**reason**
11:15, 18:11, 18:21, 66:20, 69:10, 90:19, 91:7
**reasons**
77:4
**recall**
8:13, 9:5, 10:1, 14:4, 14:21, 22:11, 22:13, 26:9, 26:13, 27:10, 31:18, 35:17, 35:21, 46:1, 46:9, 46:22, 47:7, 48:6, 55:6, 57:6, 58:2, 58:4, 61:2, 64:3, 78:15, 81:4, 90:13
**receive**
6:12
**received**
6:11, 74:14
**receiver**
78:7, 78:20
**receivership**
24:21, 25:12, 25:14, 78:22, 79:9
**receiverships**
25:19
**recent**
74:5
**recollection**
35:4, 35:5, 47:14, 52:17, 58:19, 62:4, 82:13, 86:1
**recommendations**
49:16
**recommended**
78:10
**record**
6:14, 20:22, 28:10, 59:5, 59:14, 74:13, 77:8, 91:6, 92:3, 94:6
**recordation**
59:4
**recording**
21:20, 22:5, 22:6
**records**
41:7
**redeem**
24:9, 83:7, 84:1
**redeemed**
90:17
**redemption**
91:20
**reduced**
26:10, 94:7
**reduction**
26:14, 26:21, 26:22, 27:22
**reference**
9:1
**referenced**
41:13, 42:18, 72:5
**referring**
42:20
**refinance**
30:20
**refused**
68:15, 70:18
**regard**
43:1
**regarding**
46:9, 49:20, 51:1, 90:13
**registered**
2:16, 94:2
**regulates**
24:17, 63:6
**rehab**
36:15, 36:19
**relate**
72:15
**related**
39:21, 41:21, 43:20, 70:17, 94:10
**relationship**
52:13, 52:14, 83:1
**relevant**
14:13, 16:8, 41:15
**remaining**
19:15
**remember**
9:7, 16:3, 16:5, 16:20, 17:8, 17:11, 27:14, 27:15, 30:3, 34:20, 38:5, 38:7, 50:6, 65:10, 65:11, 85:20
**remiss**
35:13
**rendered**
40:3
**renovate**
30:22, 32:19
**rent**
29:16, 32:9
**rents**
64:14
**repaid**
23:18
**repairs**
31:3
**repeat**
6:1
**report**
4:13, 26:17, 28:22, 29:2, 29:3, 30:8, 31:17, 32:14, 32:15, 33:1, 33:2, 34:13, 34:22, 35:2, 35:7, 35:9, 37:14, 39:6
**reported**
1:22
**reporter**
2:17, 94:1,

94:3
**represent**
9:11, 15:4, 82:21
**representation**
8:17, 11:9, 11:10, 12:22, 15:20, 15:22, 16:1, 19:9, 22:9, 75:9
**represented**
20:4, 20:5, 20:16, 27:6, 56:22, 79:15, 89:22, 90:3
**representing**
62:1, 79:15, 82:8
**represents**
76:6
**request**
83:9, 83:14, 89:14, 91:7
**requested**
49:14, 90:22, 91:1, 94:9
**requests**
83:10, 85:4, 88:22, 89:6, 89:14, 91:8, 91:10
**required**
25:3, 31:8, 69:4, 69:18
**requirement**
32:10
**requirements**
18:19
**residential**
11:7
**respect**
85:1, 89:5
**responded**
55:6
**response**
83:9
**responses**
50:18
**responsibility**
86:13
**responsible**
58:21, 59:4
**responsive**
85:22
**restoring**
78:1
**retain**
9:11, 86:8, 86:10
**retained**
7:10, 8:19, 31:16, 43:22, 60:15, 60:17, 79:10
**retainer**
8:10, 8:13, 14:22
**retaining**
44:3, 44:5, 65:1
**retention**
9:21
**revealed**
12:19
**review**
35:18, 35:19, 43:8, 83:18
**reviewed**
22:12, 35:21
**revocation**
62:16
**rid**
79:11
**right**
7:8, 9:18, 12:13, 15:3, 15:6, 18:9, 20:2, 24:2, 24:9, 33:18, 38:3, 49:2, 53:3, 57:22, 58:18, 59:16, 76:2, 83:1, 87:22, 90:7, 91:22
**ring**
71:4
**robert**
30:1
**rockville**
3:7
**rolls**
60:13
**rongtao**
11:18, 11:22, 16:18, 38:7, 61:7, 80:18, 80:19
**root**
29:20
**rpr**
1:22
**ruby**
81:13, 81:15, 81:17, 82:2, 82:5, 82:7
**rudy**
81:18
**rules**
63:7, 63:8, 63:9

S

**s-e-r-i-o**
65:15
**said**
10:16, 10:22, 12:13, 12:17, 13:6, 13:10, 34:12, 36:12, 41:9, 50:17, 50:20, 52:16, 52:17, 65:3, 69:12, 69:13, 69:15, 70:14, 78:11, 80:12, 80:13, 85:18, 87:1, 94:6
**sale**
4:15, 14:17, 23:20, 24:1, 24:7, 24:8, 24:14, 24:21, 27:12, 31:13, 42:19, 45:7, 47:11, 55:19, 55:22, 58:1, 58:2, 58:6, 58:22, 59:6, 59:9, 66:1, 73:10, 73:13, 76:14, 76:21
**saleable**
78:2
**same**
17:12, 23:19, 29:19, 33:20, 56:21, 58:5, 67:18, 67:21, 68:6, 78:4, 79:1, 80:5, 90:16, 93:6
**save**
18:22
**savings**
60:8, 60:10
**saw**
27:19, 31:2, 31:11
**say**
14:8, 21:12, 24:18, 29:4, 33:12, 33:15, 34:8, 36:18, 48:6, 48:13, 49:16, 53:17, 53:19, 70:2, 81:14, 82:9, 84:22, 85:8, 87:16
**saying**
48:14, 52:5, 61:22, 64:7, 82:6, 89:2
**says**
9:5, 34:17, 73:4
**sea**
71:3, 71:4, 71:6
**seahorse**
71:5
**seal**
94:14

**sean**
10:6, 11:18, 15:3, 35:12, 38:5, 61:7, 62:1, 78:10, 78:16
**second**
10:20, 41:3, 44:20, 84:14, 84:16
**secondary**
44:18
**secured**
11:4
**security**
16:8, 25:10
**see**
11:14, 21:17, 30:16, 37:16, 67:17, 89:12
**seeing**
20:18
**seek**
10:2, 53:6
**seeking**
47:6
**seem**
64:17
**seemed**
16:6, 79:8
**seems**
36:12, 37:15, 37:16, 37:21, 40:16
**seen**
7:22, 71:18
**selecting**
60:22
**selects**
62:9
**sell**
45:6
**seller**
20:3, 60:5
**send**
38:11, 38:13, 91:12
**sending**
85:20
**sense**
57:1, 86:7, 86:10, 86:12, 86:17
**sensibly**
34:9
**sent**
11:8, 13:4, 18:18, 38:3, 38:5, 38:7, 74:10, 74:13, 85:9, 85:11
**september**
47:8, 47:12, 58:3, 66:3, 73:2
**serio**
65:13
**serio's**
65:17, 66:10, 67:1
**serves**
68:21
**services**
7:10, 10:2, 39:20, 40:3, 40:8, 41:20, 80:11, 81:9, 81:12, 82:2, 84:8
**set**
19:12, 20:17, 20:18, 40:14, 41:11, 53:10, 56:7, 68:6, 72:19, 94:13
**setting**
60:9
**settle**
63:15, 66:15, 69:11
**settled**
63:13, 66:7, 66:16, 67:17, 75:5, 75:10
**settlement**
60:15, 63:11, 63:22, 64:2, 64:22, 66:12, 66:19, 67:8, 67:9, 68:4, 68:5, 69:8, 69:10, 70:12, 70:13, 75:5, 75:11, 75:14, 75:18, 77:20
**settling**
64:12, 64:17
**seven**
21:21, 78:9
**several**
15:10, 19:13, 23:8, 23:17, 29:21, 38:4, 39:18, 49:22, 64:6, 76:20
**shape**
86:6
**she**
10:3, 13:11, 13:12, 48:14, 48:15, 49:5, 49:7, 49:9, 49:10, 49:14, 50:19, 53:2, 55:7, 65:1, 65:2, 69:7, 69:15, 70:17, 70:19, 84:19, 85:1, 85:4, 86:4, 86:19, 86:22, 87:4, 87:6, 87:9, 87:11, 87:13, 87:14, 88:7, 88:8, 88:11, 88:12, 88:13, 88:15, 88:17, 88:18, 90:3
**sheet**
8:5, 21:6, 21:12, 22:4, 84:4, 84:19, 93:9
**sheets**
19:18, 20:18, 20:22, 21:13, 22:12
**should**
33:13, 36:14, 77:6
**show**
6:9, 7:17, 39:10, 39:16, 42:17
**shown**
28:12
**shows**
40:11
**sign**
68:15, 69:19, 70:18
**signatory**
69:3
**signature**
8:11, 8:12, 11:16, 11:17, 93:14
**signature-p6yap**
94:18
**signatures**
69:9
**signed**
8:12, 8:14, 14:22, 18:1, 19:22, 81:19, 93:9
**significant**
25:2
**significantly**
68:10
**signing**
94:9
**signs**
77:7
**similar**
32:2
**simple**
91:13
**simply**
60:11
**simultaneously**
15:18
**since**
11:22, 46:7,

82:7
**sir**
5:10, 5:15, 7:13, 30:14, 41:2, 72:21
**sitting**
46:19, 54:8, 61:2, 72:11
**situation**
10:17, 22:8, 29:4, 29:5, 79:9
**slash**
19:15
**slow**
14:18
**small**
61:14, 75:12
**snapshot**
34:7
**sold**
80:21, 80:22, 81:2
**soliciting**
54:16
**some**
7:8, 7:9, 17:2, 18:10, 26:17, 27:3, 27:11, 30:13, 31:12, 31:13, 33:3, 35:14, 49:6, 51:17, 61:7, 61:10, 61:14, 61:20, 64:19, 71:22, 79:20, 80:8, 85:11, 86:6, 86:9, 89:8, 91:5
**somebody**
67:4, 78:12, 85:15, 89:16
**someone**
77:22, 78:4, 89:15
**someplace**
17:19
**something**
17:14, 52:3, 71:5, 71:7, 75:21, 91:4
**sometime**
17:7, 66:13, 81:5
**sometimes**
6:2
**somewhat**
86:8
**somewhere**
11:5
**sorry**
17:10, 28:20, 30:12, 42:10, 43:2, 56:2, 63:18, 65:18, 70:13, 73:11, 91:9
**sort**
49:6
**sorts**
20:10, 44:19
**soto**
76:6
**sought**
30:20, 53:6
**source**
71:3, 71:4, 71:6
**speak**
6:3, 18:9, 18:10, 76:5, 76:15, 76:16, 85:12
**specific**
29:8, 48:4, 49:16, 52:13, 54:5, 82:14
**specifically**
35:8, 78:21
**specificity**
77:1
**specifics**
70:6
**spell**
65:14
**spoke**
46:1
**spoken**
18:7, 90:11, 91:15
**spot**
21:10
**st**
66:5
**stages**
29:14
**start**
78:12
**starting**
40:20, 41:5
**state**
2:17, 6:13, 7:1, 59:14, 63:8, 94:22
**stated**
58:12
**statement**
40:2, 40:12
**statements**
4:14
**static**
22:17
**statistics**
35:14
**status**
19:15, 55:4, 83:19
**stem**
29:19
**step**
57:2, 78:12
**stepping**
52:16
**still**
15:4, 22:22, 24:8, 43:3, 57:19, 62:1, 72:12, 76:18, 81:7
**stops**
84:6
**stores**
21:16
**story**
32:2
**strategy**
45:10
**street**
2:6, 87:15
**strike**
56:3
**struck**
12:8, 12:12
**study**
27:3, 29:10
**subject**
14:12, 15:12, 20:19
**submission**
27:2
**subordinate**
60:11
**subpoena**
2:14, 4:9, 5:15, 6:11, 6:12
**subsection**
36:2
**subsequent**
15:22, 16:1, 62:15
**substantially**
47:22, 48:2
**substitute**
55:14
**successfully**
51:13
**such**
64:14, 83:14, 86:6
**sufficient**
24:13, 69:1, 75:16
**suggest**
27:2
**suggested**
64:20
**suggesting**
26:22, 27:5
**suite**
2:7, 3:14, 6:15
**summary**
37:16
**summer**
17:16, 46:3,

46:8, 52:10, 84:13
**suppose**
78:11
**supposed**
66:8, 68:20
**sure**
7:20, 9:17, 9:22, 10:21, 17:13, 21:1, 26:16, 30:7, 35:1, 36:9, 47:21, 64:5, 65:3, 78:16, 78:17, 85:18
**suspect**
11:22, 70:22, 84:20
**sworn**
5:4
**system**
41:9, 41:10

**T**

**take**
7:20, 25:5, 33:13, 36:4, 36:13, 45:3, 58:16, 70:3, 73:22, 77:22
**taken**
25:19, 78:7, 94:4, 94:7
**taking**
12:10, 57:4
**talk**
17:11, 17:19, 36:3
**talking**
9:9, 60:2
**tang**
53:13, 54:6, 54:9, 67:19, 68:15
**tao**
1:6, 3:10, 8:12, 9:6, 9:7, 9:11, 9:13, 10:1, 12:4, 12:6, 13:11, 13:17, 13:20, 14:20, 17:17, 17:21, 20:5, 38:11, 38:21, 39:1, 39:4, 41:5, 41:19, 42:2, 47:1, 48:10, 49:12, 49:19, 50:4, 50:10, 50:13, 50:22, 52:19, 52:22, 54:20, 55:6, 62:18, 63:2, 63:5, 63:17, 63:19, 64:6, 64:20, 67:9, 68:21, 69:3, 69:13, 70:2, 70:10, 74:8, 79:16, 80:1, 80:12, 82:14, 82:18, 83:6, 83:10, 84:5, 90:1
**tao's**
25:16, 50:1, 84:11
**target**
36:22, 37:7
**task**
15:16, 19:12, 20:17, 20:18
**tax**
14:17, 23:20, 24:1, 24:7, 24:8, 24:14, 24:21, 27:12, 31:13, 47:10, 66:1, 76:21, 83:3
**taxes**
20:8, 21:9, 23:4, 36:15, 59:4, 66:1, 66:5, 66:17, 66:18, 67:14, 68:11
**telephone**
27:4
**tell**
25:4, 26:15, 26:16, 53:21, 76:22, 91:6
**telling**
21:7, 79:16
**ten**
51:13
**tenants**
31:7, 31:13, 32:13
**tend**
23:3, 23:4
**tended**
31:9
**term**
10:11, 37:6
**terminate**
79:21
**terminated**
80:8, 80:9
**terminating**
80:1
**terms**
8:17, 19:2, 19:7, 22:7, 25:18, 33:22, 36:14, 39:4, 58:1, 61:6, 64:22, 90:17
**terrace**
3:6
**testified**
5:6, 37:1, 43:14
**testify**
5:4
**testimony**
42:2, 43:12, 93:6, 93:8, 94:6, 94:7
**th**
40:4, 40:21, 41:6, 64:2, 64:3, 67:7, 70:10, 94:14
**than**
27:6, 27:8, 27:9, 29:7, 32:21, 37:11, 39:5, 41:21, 45:4, 47:22, 52:14, 64:7, 66:15, 82:11
**that's**
5:13, 10:11, 12:4, 12:22, 18:5, 18:12, 25:21, 26:1, 27:20, 37:22, 38:18, 40:1, 40:6, 40:10, 41:12, 43:17, 45:12, 47:9, 48:2, 49:2, 51:7, 51:8, 52:12, 53:8, 56:20, 57:17, 58:17, 59:14, 59:15, 59:22, 60:12, 62:7, 68:8, 72:9, 75:10, 77:10, 80:19, 82:9, 84:5
**their**
21:15, 61:15, 76:21
**them**
14:1, 21:19, 22:12, 24:9, 29:9, 30:19, 30:21, 30:22, 31:1, 32:13, 32:20, 34:2, 44:15, 44:18, 51:15, 51:16, 52:14, 64:10, 66:15, 85:11, 86:8, 87:8
**themselves**
13:12
**then**
10:5, 12:8,

15:15, 19:12, 23:1, 36:17, 44:8, 44:15, 45:4, 55:16, 55:22, 58:9, 59:7, 59:12, 62:16, 64:8, 68:6, 73:5, 73:17, 74:15, 75:21, 77:10, 82:1, 84:2, 89:4, 89:11, 89:18, 89:21
**theoretically**
21:11, 21:12
**there**
8:10, 12:3, 14:10, 14:12, 14:14, 15:11, 15:22, 16:1, 16:16, 16:19, 17:9, 20:6, 20:13, 20:14, 20:15, 21:14, 22:2, 24:22, 25:11, 26:13, 27:15, 29:13, 29:14, 29:15, 29:16, 31:10, 32:16, 32:18, 34:18, 43:22, 44:19, 47:17, 50:5, 55:9, 55:19, 56:14, 57:2, 57:19, 57:21, 58:4, 60:8, 60:9, 66:13, 66:19, 68:21, 69:5, 69:12, 69:13, 70:2, 71:9, 74:3, 75:10, 75:14, 75:17, 77:2, 79:19, 86:5, 86:8, 89:8, 89:9, 90:19
**there's**
8:11, 9:1, 21:22, 24:8, 24:9, 27:5, 27:8, 34:17, 59:19, 68:13, 85:14
**thereafter**
94:7
**therefore**
86:11
**these**
17:1, 19:20, 23:6, 23:18, 23:20, 24:5, 24:20, 30:15, 32:4, 36:5, 44:20, 50:16, 63:16, 63:19, 67:18, 67:21, 70:3, 76:17, 77:13, 80:12, 83:7, 86:9, 87:6, 89:14
**they**
5:22, 11:6, 13:12, 14:17, 30:16, 30:17, 31:1, 31:2, 31:4, 31:5, 31:6, 31:7, 31:9, 31:10, 38:2, 45:4, 45:6, 47:17, 51:16, 53:21, 53:22, 58:20, 58:21, 59:3, 61:19, 62:13, 64:11, 64:15, 64:16, 64:17, 65:20, 66:2, 66:4, 66:6, 66:12, 66:16, 69:7, 72:16, 73:8, 76:18, 78:2, 78:3, 78:14, 78:15, 79:19, 79:20, 80:6, 81:20, 82:6, 86:2, 86:3, 86:12, 86:13, 86:14, 86:15, 87:7, 89:14
**they'll**
25:7
**they're**
8:8, 24:8
**thing**
5:20, 35:17, 63:13, 64:22, 70:15, 77:7
**things**
19:13, 21:8, 32:15, 34:21, 41:12, 64:12
**think**
12:7, 13:5, 13:14, 14:9, 15:2, 15:14, 15:18, 17:16, 18:17, 23:6, 27:14, 27:15, 30:4, 40:17, 43:17, 45:15, 45:16, 46:3, 47:8, 47:9, 47:20, 48:11, 54:5, 58:12, 62:17, 62:22, 63:15, 68:21, 71:6, 71:10, 74:5, 76:11, 76:12, 79:8, 81:2, 82:1, 86:4, 89:19, 90:16
**third**
41:4, 44:18, 44:21, 45:7, 60:9, 87:10, 88:9
**third-party**
58:16, 68:22, 69:16
**those**
8:4, 35:21, 39:1, 40:14, 41:21, 50:2, 61:13, 63:11, 69:2, 71:11, 83:4, 85:21, 86:19, 88:3, 88:7
**though**
85:6
**thought**
34:14, 79:20
**three**
9:14, 14:15, 21:21, 27:19, 83:15, 85:20
**threw**
35:14
**through**
25:22, 27:12, 29:21, 35:17, 35:19, 40:5, 66:4, 76:19, 88:12
**thrown**
30:11
**thumbnail**
33:1
**tight**
67:16
**time**
7:20, 9:4, 9:10, 9:15, 11:4, 12:15, 17:12, 18:3, 18:6, 19:1, 22:13, 23:19, 24:13, 26:4, 26:7, 26:8, 31:16, 31:22, 33:20, 34:7, 40:12, 40:16, 41:10, 43:22, 49:8, 52:12, 53:20, 54:18, 55:4, 55:9, 56:14, 57:6, 58:5, 58:10, 58:16, 61:21, 63:10, 67:6,

72:7, 74:19, 81:4, 81:18, 83:14, 84:7, 84:14, 84:15, 84:16, 88:1, 88:18
**time's**
73:4
**times**
18:11, 50:3, 58:16, 83:5
**timing**
19:2
**ting**
53:13, 54:6
**title**
25:8, 60:14, 60:17, 60:18, 61:3, 62:6, 64:9, 64:20, 65:1, 65:2, 65:5, 65:6, 65:8, 65:10, 77:5, 77:6, 77:9, 90:6
**today**
19:10, 71:17, 72:11
**together**
15:19
**told**
50:11, 54:5, 54:22, 55:1
**tom**
74:9, 90:11
**took**
57:1
**topic**
13:13
**total**
23:6, 40:8, 47:18
**towson**
6:16
**trade**
31:5
**traditional**
79:9
**trail**
3:6
**transaction**
11:21, 16:5, 26:8
**transcript**
4:7, 6:8, 7:16, 28:9, 39:15, 42:16, 71:15, 94:5
**transcription**
93:7
**transfer**
59:4
**transferred**
65:16, 65:19
**transfers**
77:9
**translate**
50:17, 84:21, 89:11
**translated**
85:15
**translator**
88:13
**trash**
22:20
**tried**
67:10
**troubled**
29:12
**true**
51:7, 53:5, 93:6, 94:5
**trust**
10:19, 11:4, 16:9, 44:8, 57:14, 81:2, 81:3, 81:16
**trustee**
55:14, 57:11
**truth**
5:5, 5:6, 53:22
**try**
6:3, 22:8, 49:8, 66:20, 79:13, 86:7
**trying**
8:22, 9:20, 14:19, 17:11, 19:2, 27:21, 37:21, 51:8, 59:18, 88:20
**tunc**
73:9
**turn**
29:18
**turned**
26:17, 34:20
**two**
8:3, 8:6, 10:14, 14:15, 16:19, 21:21, 22:21, 27:4, 29:16, 30:1, 30:15, 32:3, 32:15, 61:13, 71:11, 74:8, 83:15, 85:20
**two-year**
67:13
**type**
86:1
**typed**
11:17, 12:21, 13:2
**typewriting**
94:8
**typical**
29:3, 57:17, 64:13
**typically**
10:10, 21:3, 21:13, 24:3, 50:3, 62:9, 78:7, 78:21
**tysons**
17:18, 50:1

**U**

**uh-huh**
88:6
**ultimate**
44:8, 52:6
**ultimately**
12:1
**under**
30:9, 35:3, 56:17, 94:8
**undercapitalization**
46:11, 82:15, 82:19
**underlying**
35:20
**understand**
9:17, 26:19, 32:9, 37:2, 42:2, 53:4, 68:5, 79:5, 79:19
**understanding**
14:19, 27:21, 32:5, 50:9, 57:5, 59:22, 66:12, 69:5, 70:15, 72:11, 72:13, 75:3, 75:11
**understood**
10:11, 19:3, 50:19, 55:7, 56:19, 85:18
**undertaken**
34:9
**unless**
45:9, 74:17, 91:4
**unpaid**
20:8, 20:9
**until**
12:7, 66:7
**updated**
91:11
**upon**
47:16, 47:18, 67:10, 68:10, 83:17, 83:20, 87:20, 88:8
**upside**
33:22
**use**
22:7, 55:12
**used**
41:11
**using**
86:19

**usually**
58:10, 85:21
**utilities**
31:14

**V**

**v**
1:5
**vague**
53:5, 53:7
**valkenet**
3:11, 3:12, 74:9, 76:6, 90:14, 91:1, 92:2
**valkenet's**
90:8
**various**
10:15, 11:20, 20:9, 21:8, 29:14, 79:3
**venture**
36:4
**ventures**
62:13
**verbal**
33:2
**verbally**
15:15
**verify**
22:8
**verstandig**
74:9, 91:15
**very**
13:9, 21:13, 21:20, 31:2, 32:2, 37:7, 44:21, 51:20, 56:12, 66:19, 77:7, 81:5, 88:22
**vest**
51:20
**violation**
29:6
**violations**
20:9, 25:1
**virginia**
17:18
**vis-a-vis**
31:3
**voice**
6:3
**void**
73:9, 73:12

**W**

**walked**
40:15
**want**
5:22, 19:4, 40:15, 76:16
**wanted**
25:15, 33:5, 33:18, 33:21, 38:1, 48:5, 85:17, 87:4, 87:7, 88:11, 88:13
**wants**
76:4, 76:11, 76:13
**washington**
6:15
**wasn't**
44:9, 75:13, 81:21
**water**
20:9, 21:9, 23:3, 23:10, 23:11, 31:14, 47:11
**way**
21:10, 21:15, 22:2, 22:18, 29:10, 32:18, 37:22, 41:17, 79:7, 81:3
**we'll**
26:18
**we're**
13:13, 39:11, 45:10, 60:2, 61:21, 62:3, 67:12, 76:12
**we've**
12:13, 67:11
**week**
74:6
**weeks**
22:21
**weiss**
42:6, 80:13
**well**
8:6, 10:7, 11:19, 13:11, 17:14, 21:2, 21:20, 21:22, 22:16, 24:15, 25:18, 27:3, 27:14, 28:17, 28:20, 33:13, 40:21, 44:5, 45:15, 47:4, 48:13, 50:12, 52:5, 53:17, 54:1, 54:6, 56:12, 64:4, 70:12, 70:22, 71:21, 73:17, 74:17, 81:17, 82:3, 85:8, 88:11, 89:5, 91:6
**went**
25:22, 29:10, 32:1, 49:8, 55:22, 56:16, 74:7, 74:8
**weren't**
23:18, 53:21, 53:22, 64:15, 66:2, 66:6
**what**
7:3, 10:11, 13:12, 15:14, 15:20, 16:6, 18:18, 19:6, 19:17, 19:19, 20:4, 20:21, 21:11, 22:11, 23:21, 24:2, 24:22, 26:4, 26:5, 28:12, 29:1, 30:16, 31:4, 32:1, 32:16, 32:19, 33:6, 33:19, 33:22, 34:6, 34:10, 36:3, 36:6, 37:1, 38:9, 44:3, 44:9, 46:13, 46:16, 46:19, 49:8, 49:9, 50:20, 51:8, 51:10, 52:16, 52:17, 56:22, 59:18, 63:7, 64:7, 64:16, 65:12, 65:20, 70:14, 72:8, 72:9, 73:17, 73:22, 77:16, 79:14, 79:15, 79:16, 80:6, 81:4, 83:7, 84:1, 85:18, 86:4, 87:7, 88:14, 89:20, 90:12, 90:13, 90:17, 90:18
**what's**
6:9, 7:17, 39:16, 42:17
**whatever**
25:15, 29:7, 31:6, 31:7, 31:8, 31:10, 61:12, 66:18, 71:10
**whatsoever**
64:11, 71:20
**when**
5:22, 14:8, 16:11, 16:13, 17:8, 20:11, 21:19, 22:11, 24:8, 43:22, 45:13, 47:9, 48:6, 48:13, 52:9, 53:20, 55:9, 56:14,

58:2, 63:7,
63:15, 64:10,
64:16, 83:13,
83:22, 87:16
**where**
8:16, 10:17,
19:2, 23:18,
33:10, 34:8,
36:3, 36:14,
40:14, 67:12,
75:12, 79:9,
84:5, 89:7, 89:9
**where's**
13:6
**whereas**
72:4
**whereof**
94:13
**whereupon**
5:2
**wherever**
21:15, 50:2
**whether**
8:13, 14:21,
27:10, 28:1,
34:20, 35:21,
46:9, 57:18,
76:18, 77:1,
81:21
**which**
6:11, 6:19,
10:7, 15:16,
16:16, 16:17,
17:12, 17:18,
18:18, 19:2,
19:9, 19:16,
20:19, 21:5,
33:6, 35:19,
43:11, 44:9,
44:15, 46:8,
49:20, 51:2,
53:18, 58:10,
66:8, 67:6,
72:5, 77:8,
77:20, 86:9,
86:11, 86:12,
88:17, 91:11
**who**
2:18, 8:18,
8:19, 11:8,
12:15, 12:19,
13:8, 14:4,
16:18, 16:21,
31:18, 35:6,
42:6, 48:6,
48:7, 48:12,
48:20, 50:8,
50:11, 51:20,
52:2, 52:6,
52:11, 53:4,
60:2, 61:2,
61:13, 63:7,
65:9, 69:7,
69:19, 72:7,
77:13, 78:17,
83:3, 83:4,
84:9, 85:3,
88:3, 89:15,
89:16
**who's**
78:15
**whole**
5:5, 35:17
**whom**
16:14, 35:11,
41:15, 46:1,
67:4, 94:3
**whomever**
25:6, 68:19
**whose**
10:6, 10:8,
50:6, 84:20
**why**
9:1, 18:12,
21:22, 26:13,
26:15, 27:22,
41:6, 48:3,
51:1, 57:15,
63:13, 66:21,
67:1, 70:11,
82:1, 82:9
**wife**
54:9
**will**
6:3, 12:20,
13:10, 25:4,
25:5, 44:6,
67:16, 72:14,
74:18, 74:19,
74:20
**william**
42:6
**win**
45:10
**wipe**
60:11
**wired**
14:4, 15:1
**wiring**
14:1
**wisdom**
71:8
**with**
9:7, 9:8, 9:13,
11:6, 11:20,
13:16, 13:20,
16:14, 16:15,
17:15, 19:4,
21:11, 24:1,
24:16, 25:7,
27:2, 27:4,
27:20, 29:5,
30:2, 32:4,
32:7, 33:3,
36:7, 37:1,
38:9, 38:21,
39:1, 39:3,
40:20, 41:10,
41:15, 43:1,
43:9, 43:19,
45:20, 46:1,
46:2, 46:16,
47:1, 49:6,
49:12, 52:18,
53:21, 54:19,
57:22, 61:22,
62:11, 62:17,
62:18, 62:20,
63:2, 63:3,
63:5, 63:16,
63:19, 64:6,
64:12, 64:15,
65:5, 65:6,
65:8, 66:22,
67:3, 67:8,
67:19, 67:22,
70:9, 73:20,
75:15, 76:16,
76:22, 78:3,
78:14, 79:3,
79:22, 80:22,
82:14, 82:18,
83:2, 85:7,
87:1, 87:11,
89:3, 89:4,
89:5, 90:7
**within**
74:6
**without**
71:2
**witness**
2:19, 5:20,
6:4, 94:13
**woods**
18:18
**word**
36:22, 52:14
**work**
5:22, 10:15,
22:14, 31:7,
31:16, 33:4,
34:7, 43:19,
53:4, 55:2,
65:5, 65:7, 81:7
**worked**
31:21, 50:8,
50:9, 51:22,
66:10
**working**
23:13, 86:22
**works**
22:18
**worth**
49:9, 49:10,
51:10
**would**
5:19, 10:8,
11:10, 12:2,
24:12, 24:15,
25:8, 25:9,
29:3, 32:12,
32:19, 32:21,
33:8, 34:18,

35:13, 35:19, 36:2, 37:9, 38:22, 41:16, 44:16, 44:17, 45:4, 45:6, 47:19, 51:1, 51:15, 53:1, 53:19, 54:3, 57:11, 57:12, 59:3, 59:10, 59:11, 59:12, 60:2, 60:5, 60:6, 63:12, 65:1, 66:17, 66:18, 67:6, 68:9, 68:17, 69:1, 69:21, 70:22, 71:1, 72:5, 72:22, 73:6, 73:7, 73:8, 73:9, 73:12, 73:15, 73:18, 75:8, 75:12, 75:15, 75:16, 75:18, 76:10, 76:16, 77:20, 77:22, 78:20, 79:1, 79:10, 81:14, 83:7, 84:1, 87:7, 88:16, 89:11, 89:12

**wouldn't**
29:6, 69:11

**write**
85:15

**wrong**
28:19, 34:15

**wrote**
28:22, 32:14

**wyndhurst**
3:13

**X**

**xin**
1:6, 3:10

**xu**
11:18, 11:22, 12:1, 12:4, 12:21, 12:22, 13:7, 16:18, 38:8, 61:8, 80:18, 80:19, 80:20, 81:7

**Y**

**yard**
22:20

**yeah**
18:8, 37:19, 45:9, 53:15, 71:9, 80:21, 91:3

**year**
7:3, 24:4, 58:5, 64:3, 66:5, 68:6

**year's**
66:18, 68:11

**years**
6:22, 10:14, 23:8, 23:17, 30:19, 31:21, 44:12, 51:13, 78:9

**yes**
7:13, 8:15, 11:1, 15:11, 16:12, 20:6, 22:13, 23:15, 26:12, 27:14, 28:14, 30:10, 30:14, 30:15, 31:19, 33:10, 34:14, 34:18, 37:10, 38:6, 40:1, 41:2, 42:22, 44:2, 45:22, 46:2, 55:11, 55:15, 55:18, 55:20, 56:6, 56:9, 57:9, 59:6, 62:9, 63:20, 65:20, 67:10, 70:1, 72:21, 73:15, 73:19, 81:15, 82:10, 83:12, 87:18, 91:17

**york**
33:14

**you'd**
43:14

**you're**
5:15, 9:8, 18:22, 27:7, 33:14, 37:12, 37:20, 67:13, 78:12, 82:6, 89:2

**you've**
33:16, 34:10, 75:20

**young**
3:12, 50:5

**your**
6:13, 6:17, 7:20, 8:3, 8:8, 8:14, 10:2, 18:17, 22:12, 22:20, 30:8, 34:6, 35:3, 36:7, 36:10, 37:8, 39:20, 41:7, 42:2, 42:4, 42:8, 42:11, 42:20, 43:10, 43:12, 43:19, 47:14, 48:14, 52:17, 53:3, 55:12, 58:15, 58:18, 62:4, 62:7, 63:2, 72:11, 80:11, 81:19, 82:13, 89:3, 89:13

**yourself**
16:10

**Z**

**zty**
1:3, 3:3, 5:8, 5:12

**$**

**$1,000**
23:1

**$10,000**
13:5, 14:2, 14:4

**$150**
22:21

**$200,000**
20:7, 20:16, 22:9

**$3,000**
21:17

**$300,000**
22:16, 54:10

**$5,000**
57:7

**$50**
22:20

**$500**
22:22

**$76,000**
40:9

**$800,000**
72:4

**0**

**002408**
1:6

**002409**
4:12

**0900**
3:16

**1**

**1.1**
37:12

**10**
1:13, 58:10, 58:13, 74:6

**100**
2:6

**12**
92:3

**15**
40:21, 41:6,

47:5, 47:18, 47:20, 47:21, 55:12, 67:14, 73:2, 83:16, 83:19, 84:2
**16**
47:5
**164,000**
72:6
**17**
1:6, 47:19
**199823**
1:20

**2**

**200,000**
36:19
**2014**
10:22, 17:5, 17:7, 17:17, 40:4, 41:6, 43:15, 43:17, 46:3, 52:10, 53:10, 53:16, 53:17, 54:18, 77:21, 81:5, 84:9, 84:13
**2015**
40:5, 47:9, 47:12, 53:16, 54:19, 58:3, 61:22, 62:16, 66:4, 66:5, 66:6, 72:3, 81:6, 84:9
**2016**
64:3, 66:17, 67:7, 68:16, 70:10
**2017**
66:17
**2018**
1:12, 94:15
**202**
3:8
**2022**
94:16
**20850**
3:7
**21**
94:16
**21202**
2:8
**21204**
6:16
**21210**
3:15
**230**
3:14
**237**
3:8
**24**
1:6
**2414**
4:12
**2560**
2:7
**27**
1:12
**28**
4:13
**29**
40:4, 94:14
**2nd**
72:20, 74:1, 74:16

**3**

**30**
64:2, 64:3, 66:15, 66:16, 67:7, 70:10, 86:5, 86:9
**30,000**
85:14
**31**
36:1, 66:5
**32**
92:3
**323**
3:16
**33**
11:5, 19:17, 19:18, 29:11, 31:12, 86:5
**35**
31:21
**36**
11:5, 14:16, 27:15
**37**
1:13
**3767**
2:9
**39**
4:14

**4**

**40**
26:17, 27:3
**401**
6:15
**402**
3:6
**41**
27:3
**410**
3:16
**42**
4:15
**43**
7:2
**433**
2:9

**5**

**50**
36:13, 37:5, 37:6

**6**

**60,000**
37:11
**600**
3:13
**660,000**
26:11
**6600**
3:8
**6th**
40:5

**7**

**71**
4:16
**75**
7:4
**750,000**
26:11

**8**

**803**
6:16
**888**
2:9

**9**

**90,000**
27:22
**94**
1:21